*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 75**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

RYAN HARVEY, ROCKS OFF, INC., and WILD CAT RENTALS, INC.,
*Appellants,*

*v.*

UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, ET AL.,[1]
*Appellees.*

No. 20160362
Filed November 7, 2017

On Direct Appeal

Eighth District, Roosevelt
The Honorable Samuel P. Chiara
No. 130000009

Attorneys:

Clark B. Allred, Bradley D. Brotherson, Vernal, UT,
John D. Hancock, Roosevelt, UT, for appellants

Christopher R. Hogle, Karina Sargsian, J. Preston Stieff,
Patrick S. Boice, Craig H. Howe, Deborah Chandler, Salt Lake City,
Calvin M. Hatch, South Jordan, UT,
Daniel S. Press, Washington, D.C., for appellees

JUSTICE DURHAM authored the opinion of the Court in which
JUDGE TOOMEY joined.

---

[1] Other appellees are Dino Cesspooch (in his individual and official capacities), Jackie LaRose (in his individual and official capacities), Sheila Wopsock (in her individual and official capacities), Newfield Production Company, Newfield Rocky Mountains, Inc., Newfield RMI, LLC, Newfield Drilling Services, Inc., L.C. Welding & Construction, Inc., Scamp Excavation, Inc., Huffman Enterprises, Inc., LaRose Construction Company, Inc., and D. Ray C. Enterprises, LLC.

JUSTICE HIMONAS authored a concurring opinion.

ASSOCIATE CHIEF JUSTICE LEE authored a dissenting opinion with respect to Part IV of the majority opinion, in which CHIEF JUSTICE DURRANT joined.

Having recused himself, JUSTICE PEARCE does not participate herein; COURT OF APPEALS JUDGE KATE TOOMEY sat.

---

JUSTICE DURHAM, opinion of the Court:

## INTRODUCTION

¶1      The oil and gas industry is a major economic force in the Uintah Basin. This industry relies, to some extent, on access to the Uintah and Ouray Reservation of the Ute Indian Tribe. The plaintiffs allege that, through its ability to restrict the industry's access to tribal lands, the tribe has held hostage the economy of the non-Indian population.

¶2      Ryan Harvey, a plaintiff and part owner of the two corporations that are the other plaintiffs in this case, alleges that tribal officials from the Ute Tribe attempted to extort him by threatening to shut down his businesses if he did not acquiesce to their demands, despite the fact that his businesses do not operate directly on tribal land. After his refusal to make certain payments, the tribal officials sent a letter to the oil and gas companies operating on tribal land informing them that they would be subject to sanctions if they used any of Harvey's businesses. The tribal official's letter dried up a large portion of Harvey's business, and Harvey brought claims against the tribe, the tribal officials, various companies owned by the tribal officials, oil and gas companies, and other private companies he alleges are complicit in this extortionate behavior. Most of the defendants filed motions to dismiss on various grounds and the district court dismissed Harvey's claims against all of the defendants. On direct appeal, Harvey seeks to set aside the dismissals. We affirm the dismissal of the Ute Tribe under sovereign immunity and the dismissal of Newfield, LaRose Construction, and D. Ray C. Enterprises for failure to state a claim upon which relief can be granted. But we vacate the dismissal of the remaining defendants and remand for further proceedings consistent with the tribal exhaustion doctrine.

¶3      Given the somewhat unique character of this opinion, we take this opportunity to explain the outcome. All sitting members concur in the entirety of the opinion, except for Part IV, in which Chief Justice Durrant and Associate Chief Justice Lee dissent. Justice Himonas concurs in all of the analysis in the majority opinion and

writes separately to further explain his reasons for joining. The majority opinion incorporates Justice Himonas's concurring opinion.

**BACKGROUND**

¶4     The Ute Tribal Employment Rights Office (UTERO), a subdivision of the Ute Tribal government, manages the tribe's business activities and internal affairs. There are three members of UTERO who are named parties in this action: Director Sheila Wopsock, Commissioner Dino Cesspooch, and Commissioner Jackie LaRose (collectively "tribal officials").

¶5     Ryan Harvey and his wife, as beneficiaries of their respective trusts, own Rocks Off, Inc. and Wild Cat Rentals, Inc. Rocks Off derives most of its income from providing dirt, sand, and gravel to oil and gas companies including Newfield.[2] Wild Cat Rentals leases heavy equipment to other companies and individuals. Both are located on private fee land and do not directly access Ute Tribal land, but the items they sell and lease are often used on tribal land by the leasing or buying companies.

¶6     Beginning in late 2012, Commissioner Cesspooch began demanding that Harvey obtain permits for his businesses from the UTERO Commission or Commissioner Cesspooch would "shut [them] down."[3] Harvey attempted to explain that his businesses did not operate directly on tribal land, so he should not need a permit; however, Commissioner Cesspooch continued to put pressure on Harvey by allegedly threatening to impound all of his heavy equipment.[4] Harvey eventually relented and obtained a Ute Business License and an Access Permit from UTERO for Rocks Off.

¶7     Shortly after Harvey obtained the license and permit, Commissioner Cesspooch claimed that the license and permit were forged. Harvey met with Commissioner Cesspooch and discussed

---

[2] "Newfield," as used in this opinion, refers to Newfield Production Co., Newfield Rocky Mountains, Inc., Newfield RMI, LLC, and Newfield Drilling Services, Inc.

[3] We recite the facts as pled in the complaint because, on a motion to dismiss, "we accept the plaintiff's description of facts alleged in the complaint to be true . . . ." *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 7, 342 P.3d 224 (citation omitted).

[4] Harvey alleges that the majority of these demands were made off of reservation land.

the issue. After the meeting, Harvey believed that the misunderstanding had been corrected and that Commissioner Cesspooch was no longer challenging the validity of the documents.

¶8 Not long after the meeting, Harvey was driving down a road off of tribal land when Commissioner Cesspooch "pulled his vehicle next to [Harvey's] and aggressively pointed for him to pull over." After pulling into a parking lot, Commissioner Cesspooch and Harvey had a conversation, during which Commissioner Cesspooch told Harvey that he "sure needed a good riding horse." Harvey understood this to be a demand for a bribe, but did not agree to pay or pay any money at that time.

¶9 On March 15, 2013, soon after the incident with Commissioner Cesspooch, Harvey received a letter that was sent by the UTERO Commission and signed by Director Wopsock. It stated,

> [T]he Director of the [Energy and Mineral] Department has decided to revoke your access permit effective immediately. . . .

> The UTERO Ordinance necessarily requires that all employers subject to its Ordinance be lawfully permitted on the Reservation to perform work. Without lawful entrance upon the Reservation, Rocks Off, Inc. fails to meet the minimum standard to perform work under the provisions of the UTERO Ordinance.

> In addition to the above described actions, this letter also serves as a formal notice . . . that the UTERO Commission believes that you are not in compliance with the terms of the [UTERO] Ordinance. Specifically, the UTERO Commission has reason to believe that your company has been engaging in potentially fraudulent activities, including the submission of false and inaccurate official tribal, state, and federal documents. . . .

¶10 Then, on March 20, 2013, the UTERO Commission sent a letter to "all Oil & Gas Companies." It stated that "Rocks Off, Inc. – Ryan Harvey," along with another business that is not a party to this case, no longer had access permits "for failure to comply with the UTERO Ordinance . . . ." It went on,

> As a result of such action, these businesses and individuals are no longer authorized to perform work on the Uintah and Ouray Reservation. Any use of these businesses and individuals by an employer doing work on the Reservation after receipt of this Notice may result

4

in the assessment of penalties and/or sanctions against such employer to the fullest extent of the law.

¶11     After receiving this letter, Newfield and other oil and gas companies ceased using Rocks Off, and ceased using other businesses that leased or bought items from Rocks Off. Harvey alleges that Commissioner LaRose, who owns an interest in LaRose Construction, received bribes and work from Harvey's competitor, Huffman Enterprises, to induce Commissioner LaRose to abuse his position and divert business away from Rocks Off.

¶12     Harvey brought this action seeking declaratory judgments that the tribe and its officials exceeded their jurisdiction, injunctions against all of the defendants, and damages. He brought seven claims. Two are federal claims that the tribe and the tribal officials exceeded their jurisdiction. Five of his claims are state law claims: 1) Tortious Interference with Economic Relations; 2) Extortion against Cesspooch and Wopsock; 3) Utah Antitrust Act violations; 4) Blacklisting; and 5) Civil Conspiracy. Three motions to dismiss the amended complaint were filed by the different defendants. The Ute Tribe, Huffman Enterprises, and L.C. Welding & Construction moved to dismiss the tribe for lack of subject matter jurisdiction under the theory of tribal sovereign immunity and under the tribal exhaustion doctrine. *See* UTAH R. CIV. P. 12(b)(1). They also moved to dismiss the other defendants, arguing that the tribe is a necessary and indispensable party that cannot be joined to the action. *See id*. 12(b)(7); *id*. 19. All of the other defendants joined in this motion.[5] Various other defendants moved to dismiss for failure to state a claim upon which relief can be granted. *See id*. 12(b)(6). After all of the motions to dismiss had been completely briefed, and after oral arguments were held, Harvey moved to supplement his amended complaint under Utah Rule of Civil Procedure 15(d). The district

---

[5] The district court's judgment states that the tribe's motion under rule 12(b)(7) was "joined by all of the defendants." However, we note a procedural oddity. Scamp Excavation was served with the amended complaint on September 26, 2013. In our review of the record, Scamp did not file an answer or a motion under Utah Rule of Civil Procedure 12. Neither did Scamp join in any of the other parties' motions to dismiss below nor file a brief on appeal. We raise this issue because we ultimately remand the case, but we do not address its effects on the court's judgment because Harvey did not raise it in his brief.

court held that the motion to supplement the amended complaint was untimely, refused to consider the additional facts in the supplement, and dismissed the amended complaint against all of the defendants with prejudice.

¶13    The district court held that the tribe and the tribal officials, in their official capacities, enjoyed sovereign immunity and dismissed them under Utah Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. The remaining defendants, including the tribal officials in their individual capacities, were dismissed under rule 12(b)(7) for the inability to join the tribe, which the court held was an indispensable party. Finally, Newfield, LaRose Construction, and D. Ray C. Enterprises were dismissed on alternate grounds under rule 12(b)(6) for failure to state a claim upon which relief may be granted. Although the district court did not directly rule on the tribal exhaustion doctrine, stating that it "has already granted the Tribe's Motion to Dismiss, making this issue moot," it essentially did so in substance. It stated that Harvey's claim that the tribal officials exceeded the jurisdiction of the tribe or acted outside the scope of their authority under tribal law must be addressed in the tribal court.

## STANDARD OF REVIEW

¶14    "[S]ubject matter jurisdiction is a question of law" that is reviewed for correctness, "and we accordingly afford no discretion to [the district court's] decision." *Johnson v. Johnson*, 2010 UT 28, ¶ 6, 234 P.3d 1100. We review the grant of a motion to dismiss under Utah Rule of Civil Procedure 12(b)(6) for correctness. *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991). We review a district court's dismissal of a complaint for failure to join an indispensable party for abuse of discretion and the district court's underlying legal conclusions for correctness. *See Green v. Louder*, 2001 UT 62, ¶ 40, 29 P.3d 638 ("A trial court's determination of whether a party should be joined to an action will not be disturbed absent an abuse of discretion."); *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012) ("We review a Rule 19 dismissal for abuse of discretion and underlying legal conclusions de novo."). We review a district court's denial of a motion to supplement a pleading for abuse of discretion. *See Rowley v. Milford City*, 352 P.2d 225, 226 (Utah 1960) ("[P]ermitting supplementary pleadings is largely discretionary with the trial court.").

**ANALYSIS**

¶15   We first discuss the Ute Tribe's immunity from suit. Next, we address the immunity enjoyed by the tribal officials in their official and their individual capacities. We then determine that the tribe is not a necessary and indispensable party, but that the extent of the tribe's jurisdiction should be determined by the tribal court in the first instance. We then address Harvey's motion to supplement his amended complaint. Finally, we address the various motions to dismiss that were granted under Utah Rule of Civil Procedure 12(b)(6).

I. THE UTE TRIBE DID NOT WAIVE SOVEREIGN IMMUNITY

¶16   "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998). This immunity extends to on- or off-reservation activities, *id.* at 760, and includes claims in "civil actions for injunctive or declaratory relief." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978). "The issue of sovereign immunity is jurisdictional," depriving this court of jurisdiction if the tribe has not waived its immunity or Congress has not authorized the suit. *Ramey Constr. Co. v. Apache Tribe of Mescalero Reservation*, 673 F.2d 315, 318 (10th Cir. 1982). Additionally, the "waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo*, 436 U.S. at 58 (internal quotation marks omitted) (citation omitted); *see also C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001) (A tribe's waiver of sovereign immunity "must be 'clear.'" (citation omitted)).

¶17   The district court held that the Ute Tribe did not waive its sovereign immunity, but Harvey argues that the tribe has waived it by making a general appearance in the case. Harvey claims that the tribe made a general appearance when it sought "affirmative relief from the trial court" by moving to dismiss itself under sovereign immunity and moving to dismiss the remaining defendants because the tribe is a necessary and indispensable party. The tribe counters Harvey's general appearance argument on two grounds. First, the tribe argues that sovereign immunity is an issue of subject matter jurisdiction, and that "[t]he doctrines of 'general' and 'special' appearance . . . are associated with personal jurisdiction only." *Curtis v. Curtis*, 789 P.2d 717, 725 n.17 (Utah Ct. App. 1990), *overruled on other grounds by In re Adoption of Baby E.Z.*, 2011 UT 38, 266 P.3d 702. It therefore argues that, even if the tribe made a general appearance, that action cannot constitute a waiver of its sovereign immunity.

Second, the tribe argues that filing a motion to dismiss does not constitute a clear and unequivocal waiver of sovereign immunity.

¶18    Prior to the promulgation of Utah Rule of Civil Procedure 12, a party that made a general appearance in a case waived any claim that the court lacked personal jurisdiction. If the party made a special appearance with the sole purpose of challenging the court's jurisdiction, the party's jurisdictional argument was not waived. CHARLES ALAN WRIGHT ET AL., 5C FED. PRAC. & PROC. CIV. § 1362 (3d ed. 2017 update) ("Formerly, a jurisdictional challenge was made by means of a . . . 'special' appearance. However, if a challenge of this type was joined with any nonjurisdictional defenses, the appearance became 'general' and the party's right to object to the court's jurisdiction over his or her person was deemed waived." (citations omitted)); *but see* UTAH R. CIV. P. 12(b) ("No defense or objection is waived by being joined with one or more other defenses or objections in a . . . motion . . . ."). This only applied to personal jurisdiction, as subject matter jurisdiction can be raised at any time during the pendency of the case and typically cannot be waived. *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 25 ("[S]ubject matter jurisdiction goes to the heart of a court's authority to hear a case, it is not subject to waiver and may be raised at any time . . . ." (citation omitted)). Thus, the common law doctrine of general appearances does not apply to subject matter jurisdiction.

¶19    However, while sovereign immunity has been classified as an issue of subject matter jurisdiction, it is not the same as other defects in subject matter jurisdiction. *Cash Advance & Preferred Cash Loans v. State*, 242 P.3d 1099, 1113 (Colo. 2010) (en banc) (stating that courts vary on whether sovereign immunity affects subject matter jurisdiction, and holding that, "tribal sovereign immunity bears a substantial enough likeness to subject matter jurisdiction to be treated as such for procedural purposes"). Subject matter jurisdiction, generally, cannot be waived, *Curtis*, 789 P.2d at 726, but sovereign immunity can be waived. *Kiowa Tribe of Okla.*, 523 U.S. at 754. When sovereign immunity itself has been waived, there is no defect with subject matter jurisdiction. The tribe does not waive subject matter jurisdiction; it waives sovereign immunity, which removes the jurisdictional bar. Thus, the issue is not whether the tribe has waived subject matter jurisdiction by making a general appearance (which is not possible), but whether it has clearly and unequivocally waived sovereign immunity, thereby removing the defect in jurisdiction. There may very well be instances in which a tribe takes actions in a lawsuit that clearly and unequivocally waive its sovereign immunity.

¶20 Harvey cites three cases supporting the proposition that the Ute Tribe can, and did, clearly and unequivocally waive its sovereign immunity by its actions in the current lawsuit. In *Friends of East Willits Valley v. County of Mendocino*, the court stated that a "[t]ribe waived sovereign immunity previously when it made a general appearance in this case." 123 Cal. Rptr. 2d 708, 715 (Cal. Ct. App. 2002). But that court did not cite any authority for the proposition nor did it discuss any facts that led the court to conclude that the tribe had made a general appearance. Additionally, the court held that the tribe had "expressly waived sovereign immunity" in a contract. *Id.* *Friends* is not persuasive because it contains no analysis, cites no authority, and relied on an independent basis for holding that the tribe's sovereign immunity had been waived. The next case cited by Harvey, *Nushake, Inc. v. State Compensation Insurance Fund*, is likewise unpersuasive because there was a settlement agreement containing an unequivocal waiver of immunity and a consent to enforcement of the agreement in state court. No. CGC-05-441299, 2011 Cal. Super. LEXIS 319, at *1 (Cal. App. Dep't Super. Ct. Apr. 29, 2011). The final case cited by Harvey is *United States v. Oregon*, 657 F.2d 1009 (9th Cir. 1981). In that case, the tribe intervened in an ongoing lawsuit to "protect its treaty fishing rights." *Id.* at 1014. The court held that the tribe's intervention "constitutes consent." *Id.*

¶21 At most, the cases cited by Harvey show that a tribe could possibly waive its immunity when it proactively enters litigation. This case is clearly different. Here, the Ute Tribe was sued and then sought to dismiss the complaint against itself under sovereign immunity, and against its officers and the other defendants for failure to join an indispensable party—namely, the failure to keep the Ute Tribe as a defendant. Moving to dismiss itself on sovereign immunity grounds is the opposite of a clear and unequivocal waiver of immunity; in fact, it is an assertion of that immunity.

¶22 Likewise, moving to dismiss its officers and the other defendants from the case for the inability to add the tribe as a party does not constitute a clear and unequivocal waiver of immunity. Moving to dismiss the other defendants for failure to join an indispensable party is not the same as filing a complaint or moving to intervene in a case. By filing a complaint or intervening in a case, a party proactively enters litigation and "makes himself vulnerable to complete adjudication by the . . . court of the issues in litigation between the" parties. *United States v. Oregon*, 657 F.2d at 1014 (citation omitted). Conversely, under Utah Rule of Civil Procedure 19(a)(2), a non-party has the right to get the case dismissed if the person "claims an interest relating to the subject of the action and is

so situated that the disposition of the action in [its] absence may . . . impair or impede [its] ability to protect that interest." One of the central issues in this case is the ability of the tribe to require permits and regulate oil and gas companies that access tribal land. The tribe apparently did not want the case to proceed, and possibly affect its interests, if the tribe were to be dismissed.

¶23 These motions to dismiss, alone, are not enough to constitute a clear and unequivocal waiver of sovereign immunity. Indeed, as noted above, the tribe's actions were just the opposite of waiving sovereign immunity: it asserted its sovereign immunity by seeking to dismiss itself, and then sought to have the remainder of the case dismissed so that its interests would not be affected by a judgment in a case where the tribe was not a party. While we do not definitively state how or if a tribe can waive its immunity by participating in a lawsuit, we hold that the Ute Tribe did not unequivocally waive its immunity in this case. We affirm the district court and hold that the Ute Tribe is immune from suit and is dismissed under Utah Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.

## II. CLAIMS AGAINST THE TRIBAL OFFICIALS IN THEIR OFFICIAL CAPACITIES AND IN THEIR INDIVIDUAL CAPACITIES

¶24 Harvey's amended verified complaint names Director Wopsock, Commissioner LaRose, and Commissioner Cesspooch as defendants in their individual and in their official capacities. However, there are different standards with different remedies when a tribal official is sued in her official capacity versus her individual capacity. Unfortunately, the complaint neither separated the claims or the remedies sought between the tribal officials in their official versus their individual capacities, nor did Harvey separate his arguments on appeal. He merely argues that the tribal officials acted *ultra vires* and, therefore, are not immune from suit.[6]

---

[6] Harvey incorrectly asserts that this is a fact that we must assume to be true on a motion to dismiss. This confuses the standard. On a motion to dismiss, "we accept the factual allegations in the complaint as true" and we make all reasonable inferences in favor of the non-moving party, *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 9, 104 P.3d 1226, but we do not accept a complaint's legal conclusions as true. *Franco v. The Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 26, 21 P.3d 198 ("The sufficiency of

(continued . . .)

Nevertheless, we construe complaints "to do substantial justice," UTAH R. CIV. P. 8(f), often "disregard[ing] technicalities" and looking at the "substance," *Lang v. Lang*, 403 P.2d 655, 657 (Utah 1965). *See Fishbaugh v. Utah Power & Light, a Div. of Pacificorp*, 969 P.2d 403, 406 (Utah 1998) (liberal notice pleading only requires pleadings to "be sufficient to give 'fair notice of the nature and basis of the claim asserted and a general indication of the type of litigation involved'" (citation omitted)). We therefore read his complaint "under our liberal standard of notice pleading." *Canfield v. Layton City*, 2005 UT 60, ¶ 14, 122 P.3d 622.

¶25 In parsing Harvey's complaint, we must align the remedies sought with the claims brought. In general, a claim cannot be brought against a tribal official when the tribe is the real party in interest (also known as an official capacity suit), because the tribe's sovereign immunity extends to the tribal official. *See Lewis v. Clarke*, 137 S. Ct. 1285, 1290 (2017) ("[C]ourts should look to whether the sovereign is the real party in interest to determine whether sovereign immunity bars the suit."); *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476, 479 (9th Cir. 1985) ("[T]ribal immunity extends to individual tribal officials acting in their representative capacity and within the scope of their authority."). There is at least one exception to this general rule—a plaintiff may sue a tribal official in her official capacity for an injunction under *Ex parte Young*, 209 U.S. 123 (1908).

¶26 A plaintiff can bring a claim against a tribal officer in her individual capacity only if the individual, not the tribe, is the real party in interest. "The critical inquiry" in determining the real party in interest is "who may be legally bound by the court's adverse judgment." *Lewis*, 137 S. Ct. at 1292–93. The plaintiff's claim is "an

---

(continued . . .)
. . . pleadings 'must be determined by the facts pleaded rather than the conclusions stated.'" (citation omitted)); *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 7, 342 P.3d 224 ("When 'reviewing a dismissal under Rule 12(b)(6) . . . we accept the plaintiff's description of facts alleged in the complaint to be true, but we need not accept extrinsic facts not pleaded nor need we accept legal conclusions in contradiction of the pleaded facts.'" (citation omitted)). Thus, we must accept the allegations that the tribal officials took certain actions as true, but whether those actions exceeded the tribe's jurisdiction is a legal determination that we do not accept as true.

official-capacity claim," rather than an individual capacity claim, "[if] the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself." *Id.* at 1291. "In making this assessment, courts may not simply rely on the characterization of the parties in the complaint, but rather must determine in the first instance whether the remedy sought is truly against the sovereign." *Id.* at 1290. If the remedy operates against the tribe or the "official's office" rather than the individual, the claim is not truly against the individual and it is typically barred by the tribe's sovereign immunity. *Id.* at 1291. If it operates solely against the individual, such as a claim for money damages that only the individual would be liable for, it is an individual capacity suit. Harvey seeks multiple declaratory judgments and injunctions, the majority of which are to operate against the "Ute Tribe and tribal officials." He also seeks general, specific, treble, and punitive damages. We discuss Harvey's claims and remedies against the tribal officials in their official capacities, then in their individual capacities.

### A.  Harvey's Claims Against the Tribal officials in Their Official Capacities

¶27    Under *Ex parte Young*, state officials can be sued for injunctive relief in their official capacities for violating federal law. 209 U.S. at 167. This is because federal law is the "supreme authority of the United States," and no subordinate sovereign, like a state or tribe, can "impart to the official immunity" from the supreme law of the land. *Id.* This doctrine "permits actions for prospective non-monetary relief against state or tribal officials in their official capacity to enjoin them from violating federal law." *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1181 (9th Cir. 2012); s*ee also Frazier v. Simmons*, 254 F.3d 1247, 1253 (10th Cir. 2001); *Edelman v. Jordan*, 415 U.S. 651, 667–68 (1974) (stating that plaintiffs may seek prospective injunctions against officials, which may have "an ancillary effect on the state treasury," but not damages for past actions). This doctrine applies to tribal officials as well as state officials. *Big Horn Cty. Elec. Co-op., Inc. v. Adams*, 219 F.3d 944, 954 (9th Cir. 2000) ("[S]uits for prospective injunctive relief are permissible against tribal officers under the *Ex parte Young* framework.") (citing *Burlington N. R.R. Co. v. Blackfeet Tribe of Blackfeet Indian Reservation,* 924 F.2d 899, 901 (9th Cir. 1991), *as amended* (Mar. 18, 1991), *overruled on other grounds by Big Horn Cty. Elec. Co-op., Inc.*, 219 F.3d 944).

¶28    On appeal, Harvey only indirectly argues for the application of *Ex parte Young*. He argues that the tribal officials acted

*ultra vires* and are therefore not immune from suit. Many of the cases Harvey cites for this proposition, however, cite back to *Ex parte Young*.[7] *See, e.g., Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 514 (1991) (citing *Ex parte Young* for the proposition that "we have never held that individual agents or officers of a tribe are not liable for damages in actions brought by the State"); *Blackfeet Tribe,* 924 F.2d at 901 (citing *Ex parte Young* for the proposition that "sovereign immunity does not extend to officials acting pursuant to an allegedly unconstitutional statute").

¶29 The tribal officials, along with the Ute Tribe, argue that *Ex parte Young* does not apply to a claim that the tribal officials exceeded their authority under *tribal* law.[8] This assertion is correct— *Ex parte Young* only applies when bringing a claim under *federal* law, it does not apply to bringing a claim against a tribal official for violating *tribal* law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124–25 (1984) (holding that *Ex parte Young* does not apply to a claim that state officials violated state law); *Salt River*, 672 F.3d at 1181.

¶30 But this misses the point on some of Harvey's claims. Two of his claims assert that the Ute Tribe and the UTERO exceeded their jurisdiction. These claims "seek an injunction restraining the Ute Tribe and Tribal officials from attempting to regulate Plaintiffs' business activities in a manner that exceeds the jurisdiction of the Tribe, [and] the authority of the Tribal officials." Harvey's claim that the tribal officials exceeded the tribe's jurisdiction is a question of federal law. *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471

---

[7] While Harvey only indirectly argues for *Ex parte Young*, the tribe and the tribal officials directly argue against its application.

[8] The district court dismissed the complaint under this line of reasoning. It stated that, "[w]hether the Tribal officials exceeded the scope of authority given to them by the UTERO Ordinance necessarily requires examining and interpreting the UTERO Ordinance," which the district court stated should be done in the tribal courts, citing *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 (1987) ("Adjudication of such matters by any nontribal court also infringes upon tribal law-making authority, because tribal courts are best qualified to interpret and apply tribal law."). While the tribal court should be granted the first right to interpret its own law, *see infra* ¶¶ 41–53, this misses the other claim that the officials exceeded the scope of the tribe's authority, which is a question of federal law.

U.S. 845, 851 (1985) ("[F]ederal law defines the outer boundaries of an Indian tribe's power over non-Indians."). The remedies sought are clearly against the tribe as the real party in interest. For this reason, we treat Harvey's claims for injunctions as against the tribal officials acting in their official capacities. The tribal officials, in their official capacities, do not enjoy sovereign immunity for these two claims and the injunctions sought under these two claims.

¶31 But any claim that the tribal officials, in their official capacities, exceeded the authority granted to them by the tribe is not subject to *Ex parte Young* and is barred under sovereign immunity, along with the rest of Harvey's state law claims and requests for monetary damages. *See Halderman*, 465 U.S. at 124–25 (*Ex parte Young* applies only to federal law claims). Harvey is not entitled to damages against the officials in their official capacities because official capacity suits, under *Ex parte Young*, may only be brought for prospective injunctive relief. Thus, we treat Harvey's claims for injunctive relief as against the officials in their official capacities, and his claims for damages as against the officials in their individual capacities.

*B. Harvey's Claims Against the Tribal Officials in Their Individual Capacities*

¶32 The U.S. Supreme Court recently clarified that a tribal official is not protected by sovereign immunity when she is sued in her individual capacity. *Lewis*, 137 S. Ct. at 1291. The court stated that, in "[p]ersonal-capacity suits" the plaintiff "seek[s] to impose *individual* liability upon a government officer for actions taken under color of [tribal] law." *Id*. Thus, because the individual—not the tribe—will "be legally bound by the court's adverse judgment," sovereign immunity is not applicable. *Id*. at 1292–93. While not entitled to sovereign immunity, "[a]n officer in an individual-capacity action . . . may be able to assert *personal* immunity defenses." *Id*. at 1291.

¶33 Harvey has asserted claims against the tribal officials in their individual capacities for damages, making the individuals the real parties in interest. We do not hold that Harvey has valid claims against the tribal officials in their individual capacities, merely that they do not enjoy sovereign immunity at this stage of the litigation. If, at some point, it becomes clear that any remedy sought by Harvey would essentially operate against the tribe, those claims must be dismissed against the officials unless they comply with the requirements of *Ex parte Young*. The district court must tread carefully in this area to avoid meddling with the internal operations of the tribal government.

## III. THE DISTRICT COURT ERRED IN DISMISSING THE CASE FOR FAILURE TO JOIN AN INDISPENSABLE PARTY

¶34 Having determined that the tribe is entitled to sovereign immunity, but that the tribal officials are not, we are led to the ultimate question. Did the district court err in dismissing the tribal officials and the remaining defendants because the Ute Tribe is a necessary and indispensable party but is immune from suit? Utah Rule of Civil Procedure 12(b)(7) mandates the dismissal of an action for "failure to join an indispensable party." Dismissal under rule 12(b)(7) is only appropriate under the circumstances listed in Utah Rule of Civil Procedure 19. *Ludlow v. Salt Lake Cty. Bd. of Adjustment*, 893 P.2d 1101, 1103 (Utah Ct. App. 1995). Rule 19 necessitates a three step analysis: 1) is the person necessary, 2) can the person be joined, and 3) is the person indispensable. *See* UTAH R. CIV. P. 19; *Landes v. Capital City Bank*, 795 P.2d 1127, 1130–32 (Utah 1990).

¶35 A person is necessary under rule 19(a) in three different instances. First, a person is necessary if in the person's "absence complete relief cannot be accorded among those already parties." UTAH R. CIV. P. 19(a)(1). Second, the person is necessary if she claims an interest in the action and her absence would "impair or impede [that person's] ability to protect that interest." *Id.* 19(a)(2)(i). Finally, the person is necessary if she claims an interest in the action and her absence would "leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." *Id.* 19(a)(2)(ii). Under these standards, the Ute Tribe is not a necessary party in this case.

¶36 The Ute Tribe is immune from all of Harvey's claims in this case. *See supra* ¶¶ 16–23. Also, the tribe claims an interest in the outcome of this case because any court order must determine the ability of the tribe, and its officials, to issue orders to oil and gas businesses operating on tribal land. But the tribal officials are not immune from suit under *Ex parte Young*, 209 U.S. 123 (1908). *Salt River Project Agricultural Improvement and Power District v. Lee* is instructive. 672 F.3d 1176 (9th Cir. 2012). In that case, Navajo officials argued that the Navajo Nation was a necessary and indispensable party. *Id.* at 1178. The court held that the Navajo Nation was not a necessary party because the tribal officials, acting in their official capacities, would adequately represent the interests of the tribe. *Id.* at 1181. This case is similar.

¶37 First, complete relief may be granted to Harvey because he could obtain an injunction against the tribal officials from interfering with his businesses. This injunction would "remain[] in force against the officer's successors." *Id.* at 1180. While Harvey cannot get an

injunction against the Ute Tribe, an injunction against the tribal officials would essentially operate against the tribe. *Id.* at 1181 (stating that tribe could not enforce its ordinance "without the aid of its *officers* . . . who *would* be bound by the . . . injunction"). Additionally, his claims for money damages may be entered against the tribal officials in their individual capacities and against the other defendants, assuming they are liable under some legal theory. Harvey could thus receive his requested relief even without adding the tribe as a party.

¶38    Second, the tribe will not be impaired or impeded from protecting its interests, because the tribal officials "can be expected to adequately represent the [Ute Tribe's] interests." *Id.* at 1180. There is no argument that the tribal officials will do anything antithetical to the interests of the tribe or that they will fail to make any "reasonable argument that the tribe would make if it were a party." *Id.*

¶39    Finally, there is no risk that the other parties may be subjected to inconsistent obligations. Defendant Newfield argues that if the tribe is not a party, it could be subject to an order from a state court requiring it to pay damages to Harvey for not using Harvey's services, yet be subject to the March 20th letter from the UTERO prohibiting Newfield from using Harvey's services as long as Newfield desires to continue to operate on tribal land. No such threat exists if the tribal officials are enjoined from enforcing the March 20th letter. Additionally, if other tribal officials "attempted to enforce the [March 20th letter] against [Newfield], the plaintiffs would be free . . . to seek an injunction against those officials." *Id.* at 1181. None of the defendants have argued any other possible conflicting obligations.

¶40    The Ute Tribe does not meet any of rule 19's requirements to be a necessary party because the presence of the tribal officials, in their official capacities under *Ex parte Young*, addresses all of the concerns raised in rule 19. The district court erred in dismissing the tribal officials and the other defendants under rule 12(b)(7).

## IV. THE TRIBAL EXHAUSTION DOCTRINE PREVENTS UTAH STATE COURTS FROM REVIEWING THIS CASE AT THIS TIME

¶41    While we hold that the tribal officials may be sued for an injunction in their official capacities under *Ex parte Young*, 209 U.S. 123 (1908), and that the defendants other than the Ute Tribe should not have been dismissed under rule 12(b)(7), we hold that Harvey

failed to exhaust tribal remedies.[9] The exhaustion of tribal remedies doctrine is founded on the premise that "[p]romotion of tribal self-government and self-determination require[] that the Tribal Court have 'the first opportunity to evaluate the factual and legal bases for the challenge' to its jurisdiction." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 15–16 (1987) (citation omitted). The Ninth Circuit has held that exhaustion of tribal remedies, when a tribe's jurisdiction is at issue, is *mandatory* before another court exercises jurisdiction.

> The Supreme Court has mandated the exhaustion of tribal remedies as a prerequisite to a federal court's exercise of its jurisdiction: "[E]xhaustion *is required* before such a claim may be entertained by a federal court." In *Iowa Mutual Ins. v. LaPlante,* the Supreme Court said that "federal policy . . . *directs* a federal court to stay its hand," and "proper respect . . . *requires*" tribal remedy exhaustion. Therefore, non-Indian petitioners "*must* exhaust available tribal remedies." The *LaPlante* Court emphasized that "*National Farmers Union requires* that the issue of jurisdiction be resolved by the Tribal courts in the first instance." The Supreme Court's mandate of exhaustion of tribal court remedies as a prerequisite to a federal court's exercise of its jurisdiction applies squarely to this case.

---

[9] The district court did not rule directly on this issue because it had already dismissed the entire complaint under Utah Rules of Civil Procedure 12(b)(1) and (b)(7). Yet, the district court essentially did so implicitly by directing Harvey to the tribal court. It held that Harvey "could have raised [his] claims through tribal administrative proceedings and perhaps in the Tribal Court." In the district court, Harvey argued "that the Tribal Court is not neutral or fair," but the court saw "such an allegation, without any factual basis, no differently than if [Harvey] claimed the State's district or justice courts were inherently biased against a particular class of parties." Additionally, on appeal, Harvey argues against tribal exhaustion because "[i]n essence, the trial court determined that it was appropriate that Plaintiffs subject themselves to tribal regulatory control." Thus, while the district court's order says it does not rule on this issue, it did so implicitly, as acknowledged by Harvey on appeal. For this reason, we address this issue.

*Burlington N. R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1245 (9th Cir. 1991) (alterations in original) (citations omitted).

¶42    The requirement that plaintiffs exhaust their remedies in tribal court is a prudential matter, "based on principles of comity." *Nevada v. Hicks*, 533 U.S. 353, 398 (2001); *see also Strate v. A-1 Contractors*, 520 U.S. 438, 451 (1997) ("[T]he exhaustion rule stated in *National Farmers* [is] 'prudential.'"). When a case concerns a tribe's right to exclude individuals from their land, plaintiffs should exhaust their remedies in tribal court before getting a review in any other court. *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983) ("A tribe's power to exclude nonmembers entirely or to condition their presence on the reservation is . . . well established."); *Strate*, 520 U.S. at 454 ("tribes retain considerable control over nonmember conduct on tribal land"). This is because the tribe's right to "manage the use of [tribal] territory and resources by both members and nonmembers [and] to undertake and regulate economic activity within the reservation" is necessary to protect tribal self-government. *Mescalero Apache Tribe*, 462 U.S. at 335. This doctrine does not require a case to be pending in the tribal court. *See Crow Tribal Council*, 940 F.2d at 1246 (exhaustion requirement applies even when the plaintiff "sought a declaration of sovereign authority before it was ever prosecuted in Crow Tribal Court or otherwise subjected to Crow tribal authority"); *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 814 (7th Cir. 1993) ("Several appellate courts . . . have applied the tribal exhaustion rule to cases in which there existed no first-filed tribal court action."); *Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.*, 797 F.2d 668, 674 (8th Cir. 1986).

¶43    In this case, the majority of the actions Harvey complains of relate to the ability of the Ute Tribe to exclude non-Indians from their reservation. Harvey seeks injunctions to restrain the tribe and tribal officials from "interfering in Plaintiffs' relationship with oil and gas companies," and from "harassing, threatening, intimidating, extorting, and retaliating against Plaintiffs" and companies that do business with the plaintiffs. Harvey's factual allegations in support of these requests for injunctive relief, and the claims that the tribe exceeded its jurisdiction, are centered on four different actions that allegedly harmed the plaintiffs. First, tribal officials threatened to "'shut down' Plaintiffs' businesses and confiscate Plaintiffs' equipment" if Harvey did not obtain a UTERO license and permit, which Harvey eventually did, even though he argues he does not in fact access tribal land. Second, even after Harvey obtained a permit, Commissioner Cesspooch "attempted to extort money from Ryan [Harvey] in the IFA parking lot saying that he 'sure needed a good riding horse.'"   Third, Harvey alleges that "[a] couple of weeks after

refusing to pay Commissioner Cesspooch," Harvey's license and permit were revoked. Finally, Harvey alleges that on March 20, 2013, the UTERO sent a letter to all oil and gas companies threatening sanctions against any business utilizing Harvey's services. We address each of these allegations in turn.

¶44 Any harm actually suffered by Harvey is tied to whether the tribal officials had the authority to require him to obtain a permit, revoke his permit, and issue a letter telling oil and gas companies that they would suffer sanctions if they continued to use Harvey and operate on tribal lands.[10] The central question thus becomes whether the tribal officials were regulating who may come onto tribal land. Whether the tribe may demand that Harvey obtain a permit is a jurisdictional question that must be heard in the tribal courts in the first instance. Whether the tribal officials unlawfully revoked Harvey's permit is a question of tribal law, as the regulation of who may enter tribal lands is a matter of self-governance. The tribal court must have the first opportunity to address these issues. Otherwise, we may be supplanting tribal law that manages tribal governmental operations with state tort law.

¶45 The March 20th letter's primary and direct effect also governs who may enter tribal land. The tribe issued the letter to "all Oil & Gas Companies," including defendant Newfield. The letter states:

> [T]he UTERO Commission revoked the UTERO License for [Rocks Off and Harvey] for failure to comply with the UTERO Ordinance, Ord. No. 10-002 (July 27, 2010).

> As a result of such action, these businesses and individuals are no longer authorized to perform work on the Uintah and Ouray Reservation. Any use of [Rocks Off or Ryan Harvey] by an employer doing work on the Reservation after receipt of this Notice may result in the assessment of penalties and/or sanctions against such employer to the fullest extent of the law.

---

[10] Commissioner Cesspooch's alleged attempt to extort Harvey did not actually harm him since he did not pay the demand. The harm that was actually caused to Harvey came when his permit was revoked.

The letter only directly impacts oil and gas companies wishing to conduct business on Ute Tribal land. If an oil and gas company wishes to continue to operate on Ute Tribal land and avoid sanctions, they cannot use Rocks Off or Ryan Harvey. While the letter also affects Rocks Off and Harvey, the oil and gas companies may very well decide not to operate on Ute Tribal land and continue to use Harvey in any way they see fit. Either way, the tribe's ability to regulate business operations on their land, even if it may have an indirect effect on business off of their land, is a core question of tribal self-government.

¶46 Additionally, the actual effect of the letter on Harvey is a matter of interpretation. The letter clearly, if only indirectly, affects Harvey's businesses. However, it is susceptible to two different readings. First, the letter could be read to prohibit all oil and gas companies from using Harvey anywhere, even off of the reservation. This interpretation is supported by the letter's language that "[a]ny use of" Harvey will result in penalties. The second interpretation is that oil and gas companies may not use Harvey's equipment or products *on tribal land*. "Any use" may be qualified by the preceding sentences saying that Rocks Off and Harvey "are no longer authorized to perform work *on the Uintah and Ouray Reservation*." (Emphasis added).

¶47 Thus, the letter could be interpreted to only restrict the use of Harvey's equipment and material on tribal land or to affect use off tribal land. Either of these interpretations are reasonable, and under the doctrine of tribal exhaustion, this question of interpretation should be resolved in the first instance by a tribal court. *LaPlante*, 480 U.S. at 16 (stating that the tribal court should have "'the first opportunity to evaluate the *factual and legal bases* for the challenge' to its jurisdiction" (emphasis added) (citation omitted)). If the letter restricts use of Harvey off of the reservation, it might exceed the jurisdiction of the tribe. If it only restricts use of Harvey on the reservation, it may be within the authority of the tribe.

¶48 In a similar case decided by the Ninth Circuit, the Crow Tribe enacted an ordinance that governed private railroad operations across tribal lands. *Crow Tribal Council*, 940 F.2d 1239. The sole railroad operating on tribal lands filed for declaratory judgment in federal court, alleging that "the ordinance is null and void because it exceeds tribal sovereign power." *Id*. at 1241. The Ninth Circuit analyzed the "[t]hree imperatives arising from the nature of tribal sovereignty" to determine if exhaustion was required. *Id*. at 1245.

¶49 First, the court analyzed the policy "supporting tribal self-government," and the subordinate policy of "provid[ing] the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge." *Id.* (citations omitted). The court held that "the Crow Tribe must itself first interpret its own ordinance and define its own jurisdiction," as part of its sovereign power, even if no action had been filed in tribal court at that time. *Id.* at 1246. It went on to state that it was improper to retain federal jurisdiction over a case involving an "uninterpreted tribal ordinance" when there was "an obscure factual background." *Id.* This is directly on point in this case. We agree that, as a matter of comity, the tribe should be given the first right to interpret the March 20th letter and determine the tribe's jurisdiction. The demand that Harvey obtain a permit, the revocation of the permit, and the subsequent March 20th letter could very well be within the authority of the tribe. *See Mescalero Apache Tribe*, 462 U.S. at 333 ("A tribe's power to exclude nonmembers entirely or to condition their presence on the reservation is . . . well established.").

¶50 The second policy at play is judicial economy, to "encourage[] more efficient procedures." *Crow Tribal Council*, 940 F.2d at 1246. While the letter might be interpreted to prohibit the use of Harvey by an oil and gas company *off of tribal land*, the Ute Tribe could interpret this order to restrict the use of Harvey only *on tribal land*. If the tribe were to interpret the order in this manner, Newfield could still use Harvey's businesses off of the reservation. This argues in favor of requiring Harvey to exhaust his remedies in tribal court, allowing that court to interpret the tribe's order and vet the factual challenge to the tribe's jurisdiction as a matter of judicial economy.

¶51 The third policy in favor of exhaustion allows tribal courts to "explain to the parties the precise basis for accepting jurisdiction, and . . . also provide[s] other courts with the benefit of their expertise in such matters in the event of further judicial review." *Id.* (citation omitted). Thus, forcing Harvey to litigate in tribal court provides clarity to the parties and any reviewing court on how the tribe views its own jurisdiction.

¶52 Harvey must exhaust his remedies in tribal court, even if the tribal court must end up applying some state law. *See LaPlante*, 480 U.S. at 19 ("The alleged incompetence of tribal courts is not among the exceptions to the exhaustion requirement . . . and would be contrary to the congressional policy promoting the development of tribal courts."); *Altheimer & Gray*, 983 F.2d at 814 ("The interpretation of another jurisdiction's laws . . . does not alone foreclose application of the tribal exhaustion rule. A tribal court,

presumably, is as competent to interpret federal law as it is state law."); *Brown v. Washoe Hous. Auth.*, 835 F.2d 1327, 1328 (10th Cir. 1988) ("[F]ederal court[s] must defer to tribal court remedies as a matter of comity."). Then, if Harvey does not agree with the tribe's determination of its jurisdiction, he will be able to seek review of the tribal court's order in federal court. *Brown*, 835 F.2d at 1329 ("Once the tribal courts have acted, their determination of jurisdiction is subject to review in federal court.").

¶53    Finally, rather than dismissing Harvey's case, on remand the district court may choose to stay the state court proceedings to await the outcome in the tribal court. If the tribal court, or a reviewing federal court, determines that the tribal officials exceeded their authority or the authority of the tribe, the remaining state law causes of action may proceed.[11] But the determination to stay rather than dismiss is best made in the district court. *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 857 (1985) ("Whether the . . . action should be dismissed, or merely held in abeyance pending the development of further Tribal Court proceedings, . . . should be addressed in the first instance by the District Court."). We therefore remand to the district court for its determination on

---

[11] While the tribe's jurisdiction is only directly at issue in Harvey's first two causes of action that seek injunctions against the tribal officials, the extent of the tribe's jurisdiction would be informative, and possibly determinative, to Harvey's other state law claims for damages.  For instance, to establish a claim of intentional interference with economic relations, Harvey must establish that the tribal officials intentionally interfered with Harvey's existing or potential economic relations by improper means causing injury to Harvey. *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553. Whether the interference was by improper means requires us to determine whether the tribal officials' actions "were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession." *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 20, 116 P.3d 323 (citation omitted). The actual harm caused to Harvey was caused by the March 20th letter that prohibited oil and gas companies from using Harvey and Rocks Off. This requires us to determine whether the letter exceeded the jurisdiction of the tribe or violated some tribal law. If a tribal court determines that the letter exceeded the tribe's authority, it could be dispositive of this claim. This further justifies requiring tribal exhaustion before proceeding with any state law claims.

whether to stay or dismiss the case under the tribal exhaustion doctrine.[12] However, in the event the district court determines to stay proceedings, we address the remaining issues on appeal and hold that Newfield, D. Ray C. Enterprises, and LaRose Construction are dismissed under Utah Rule of Civil Procedure 12(b)(6).[13]

## V. THE PLAINTIFFS' MOTION FOR LEAVE TO AMEND SHOULD BE GRANTED IN PART

¶54 After Harvey filed his amended complaint, the defendants filed various motions to dismiss for failure to state a claim upon which relief can be granted. After all of the briefing and oral arguments on the motions to dismiss, Harvey moved to supplement his amended complaint. Utah Rule of Civil Procedure 15 provides that,

> [o]n motion and reasonable notice, the court may, on just terms, permit a party to file a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense.

UTAH R. CIV. P. 15(d).

¶55 We have rarely had the opportunity to address this rule. Despite the dearth of precedent, the plain language of the rule gives the district court discretion to grant or deny such a motion by stating that the court "may" allow a supplemental pleading. *Arbogast Family Tr. v. River Crossings, LLC*, 2010 UT 40, ¶ 16, 238 P.3d 1035 ("[W]e look to the express language of that procedural rule and to the cases interpreting it." (citation omitted)); *Rowley v. Milford City*, 352 P.2d 225, 226 (Utah 1960) ("[P]ermitting supplementary pleadings is largely discretionary with the trial court."). We therefore review the

---

[12] We acknowledge and agree with the excellent research and analysis in Justice Himonas's concurring opinion and charge the district court to carefully follow his additional directions on remand.

[13] While we dismiss this case against these three defendants, there are still numerous other defendants that would remain in the case assuming the district court stays rather than dismisses the entire case. For instance, Harvey's claims for injunctions against the tribal officials in their official capacities and his claims against the tribal officials in their individual capacities would survive.

district court's denial of Harvey's motion to supplement for abuse of discretion.

¶56    As the standard for granting a motion under rule 15(d) is very similar to that under 15(a), we look to our precedent under rule 15(a) for guidance. *Compare* UTAH R. CIV. P. 15(a)(2) ("The court should freely give permission [to amend a pleading] when justice requires."), *with id.* 15(d) (court may allow supplemental pleading "on just terms"). We hold that a motion to file a supplementary pleading should be freely granted unless the court finds that factors such as untimeliness, prejudice, bad faith, or futility of the amendment would make such a grant unjust. *Daniels v. Gamma W. Brachytherapy, LLC*, 2009 UT 66, ¶ 58, 221 P.3d 256.

¶57    In denying Harvey's motion to supplement, the district court found that it would be unjust to allow him to supplement his complaint to overcome pleading deficiencies three years after the first motion to dismiss was filed, and after briefing and oral arguments had already been completed on the various motions to dismiss. It alternatively held that any supplement was moot because his complaint was dismissed in its entirety. The district court did not abuse its discretion in refusing to allow the supplementary complaint when conducting its analysis of the various motions to dismiss. The motion to supplement was untimely because it was brought after completion of the briefing and oral arguments on the motions to dismiss. This delayed motion to supplement would have prejudiced the defendants because, after fully briefing and arguing their motions to dismiss, they would have had to go back and re-brief and argue their motions.

¶58    While we hold that the district court did not abuse its discretion in finding that it was untimely and prejudicial for purposes of determining the motions to dismiss, we hold that the court erred in dismissing the amended complaint in its entirety. The district court, therefore, erred in holding that the supplementary pleading was moot. While we decline to consider the supplemental pleading for our analysis of the motions to dismiss, we hold that it should be allowed as the case progresses, assuming no other problems arise.

## VI. NEWFIELD, LAROSE CONSTRUCTION, AND D. RAY C. ENTERPRISES ARE DISMISSED UNDER UTAH RULE OF CIVIL PROCEDURE 12(b)(6)

¶59    In addition to moving for dismissal under Utah Rule of Civil Procedure 12(b)(7), Newfield, LaRose Construction, and D. Ray C. Enterprises moved for dismissal under Utah Rule of Civil

Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. The district court ultimately dismissed these parties under rule 12(b)(7), and also dismissed them on alternative grounds under rule 12(b)(6). On appeal, Harvey challenges the dismissal of these defendants under rule 12(b)(6).

¶60 Utah Rule of Civil Procedure 8(a) requires plaintiffs to plead facts sufficient to show "that the party is entitled to relief." To survive a motion to dismiss, the complaint must allege facts sufficient to satisfy each element of a claim, otherwise the plaintiff has failed to show that she is entitled to relief. *Williams v. State Farm Ins. Co.*, 656 P.2d 966, 971 (Utah 1982) ("[W]hen the pleader complains of conduct . . . by such general terms as libel, intimidation, or false statements, the allegation of the conclusion is not sufficient; the pleading must describe the nature or substance of the acts or words complained of."); *MBNA Am. Bank, N.A. v. Goodman*, 2006 UT App 276, ¶ 6, 140 P.3d 589 (to adequately state a claim for relief, the plaintiff "must have alleged sufficient facts . . . to satisfy each element"); *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991) (dismissing complaint for failure to plead facts supporting one element of tortious interference with existing economic relations). Harvey brings five state law claims against these parties:[14] Utah Antitrust Act, civil conspiracy, tortious interference with economic relations, extortion,[15] and blacklisting. First, we address generally the allegations made against D. Ray C. Enterprises and LaRose Construction, then we address each claim against Newfield.

*A. Claims against D. Ray C. Enterprises and LaRose Construction*

¶61 D. Ray C. Enterprises is mentioned in only three allegations. The first is the jurisdictional statement, the other two say essentially the same thing: D. Ray C. Enterprises is owned by Cesspooch and it "participated in the conspiracy and derived

---

[14] As noted above, we treat Harvey's first two claims as solely against the tribe, as Harvey only alleges that the tribe and the tribal officials acted *utra vires*.

[15] The complaint titles this claim "Extortion Against Cesspooch and Wopsock." However, the substantive allegations of this claim discuss the "[c]o-conspirator, Newfield," and speak in broad terms with allegations against the "Defendants." Because it is not entirely clear against whom this claim is asserted, we treat it as against all defendants.

substantial economic benefit from the . . . unlawful restraint of trade." Harvey failed to plead any facts explaining what D. Ray C. Enterprises actually did to engage in wrongdoing. "[T]he allegation of the conclusion is not sufficient; the pleading must describe the nature or substance of the acts or words complained of." *Williams*, 656 P.2d at 971. We affirm the district court's dismissal of D. Ray C. Enterprises under Utah Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

¶62    Harvey alleges that LaRose Construction is owned, at least partially, by LaRose and that "Commissioner LaRose received bribes and work from defendant Huffman Enterprises, Inc. . . . in exchange for Commissioner LaRose abusing his position as UTERO Commissioner [by] wrongfully diverting business from [Harvey] to Huffman." The reasonable inference from this allegation is that Commissioner LaRose used his position as a UTERO official to benefit his company and himself. Thus, Harvey is attempting to hold LaRose Construction liable for the gains it realized due to the wrongful conduct of an owner.

¶63    Harvey does not allege any wrongful act committed by LaRose Construction itself, just the alleged wrongful acts of Commissioner LaRose that were taken in his capacity as a UTERO official. Harvey had the burden to show why the company should be liable for the acts of its owner. The owner and the company are two separate and distinct legal entities.[16] *See Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 13, 284 P.3d 630 ("Ordinarily a corporation is regarded as a legal entity, separate and apart from its stockholders." (citation omitted)). One cannot be held liable for the other's actions absent some legal theory, such as *respondeat superior*. *Birkner v. Salt Lake Cty.*, 771 P.2d 1053, 1056–57 (Utah 1989) (discussing requirements to hold company liable for conduct of employee).

---

[16] On a motion to dismiss, we make all reasonable inferences in favor of the non-moving party. If Harvey had alleged that LaRose was the sole owner of LaRose Construction, or that he acted according to a directive from LaRose Construction, our analysis might be different. Because he alleges only that Commissioner LaRose owns "an interest" in the company, and that he committed a wrongful act in his individual capacity from which the company benefited, we will not treat the two legal persons as one, nor will we hold the company liable for the actions of someone who owns an interest in it.

¶64     Harvey failed to plead any facts or make any legal arguments why we should ignore the barrier between LaRose as an individual and LaRose Construction, Inc. For this reason, he has failed to meet his burden of persuasion on appeal and we affirm the district court's dismissal of LaRose Construction under rule 12(b)(6). *Bank of Am. v. Adamson*, 2017 UT 2, ¶ 12, 391 P.3d 196 ("[A]n appellant who fails to adequately brief an issue 'will almost certainly fail to carry its burden of persuasion on appeal.'" (citation omitted)).

*B. Claims Against Newfield*

1. Utah Antitrust Act

¶65     Harvey brings an antitrust claim under the Utah Antitrust Act, UTAH CODE §§ 76-10-3101 to -3118. Utah Code section 76-10-3104(1) provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is declared to be illegal."[17] A contract, combination, or conspiracy requires two or more people; it cannot consist of unilateral or independent action. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) (In a Sherman Act claim, there must "be a 'contract, combination . . . or conspiracy' between the manufacturer and other distributors in order to establish a violation. Independent action is not proscribed." (alteration in original) (citation omitted)); *Contract*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("An agreement between two or more parties . . . ."); *Combination*, BLACK'S LAW DICTIONARY (8th ed. 2004) ("An alliance of individuals or corporations . . . ."); *Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 29, 201 P.3d 944 (stating that a conspiracy is "a combination of two or more persons" (citation omitted)). While some type of agreement is necessary, "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement" and no "formal agreement" is necessary. *Brixen & Christopher Architects, P.C. v. State*, 2001 UT App 210, ¶ 35, 29 P.3d 650 (quoting *Norfolk Monument Co. v. Weedlawn Mem'l Gardens, Inc.*, 394 U.S. 700, 704 (1969)).

---

[17] The district court also addressed Utah Constitution article XII, section 20. That article includes almost identical language, stating that "[e]ach contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is prohibited." While the district court addressed the constitutional provision, Harvey has not argued it on appeal. For this reason, we look solely at the Utah Antitrust Act.

¶66    Harvey has failed to allege facts establishing any agreement in the form of a contract, combination, or conspiracy between the tribal officials and Newfield. The complaint alleges that Newfield received the March 20th letter from the tribal officials, and then refused to use Harvey's businesses or any other "business who leases [Harvey's] equipment or utilizes [Harvey's] Products." Harvey further alleges that "Newfield's . . . cooperation with the unlawful and *ultra vires* actions of tribal officials empowers said officials." The crux of these allegations is that Newfield received a letter from the Ute Tribe threatening to sanction it if it used Harvey, or if it used any other business that used Harvey, and that Newfield then complied with the directive.

¶67    None of these allegations establish any kind of contract, combination, or conspiracy to restrain trade. In his briefing, Harvey attempts to remedy this defect in pleading by arguing that the March 20th letter was simply "asking [Newfield] to boycott" Harvey's businesses and that Newfield "expressly agreed to that request" by informing Harvey that they would no longer be using his businesses. But argument in briefing does not resolve a deficiency in pleading. Also,

> [a] restraint imposed unilaterally by government does not become concerted-action within the meaning of the statute simply because it has a coercive effect upon parties who must obey the law. The ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy. Similarly, the mere fact that [private companies] must comply with the same provisions of the [government directive] is not enough to establish a conspiracy among [the private companies].

*Fisher v. City of Berkeley*, 475 U.S. 260, 267 (1986).

¶68    Even assuming that Newfield and every other business in the region complied with the March 20th letter, it does not establish an antitrust claim. This is not to say that an antitrust or a conspiracy claim could never be established between a government entity and a private corporation. If, perhaps, Harvey had pled in his complaint that the March 20th letter was sent out at the behest of Newfield, or that Newfield had bribed the tribal officials to send out the letter, a claim for antitrust might have been adequately pled. But, as it stands, a group of private companies complying with a government directive does not create a contract, combination, or conspiracy in restraint of trade.

¶69    Harvey attempts to distinguish *Fisher* by arguing that it should not apply when one jurisdiction attempts to regulate business activities in another jurisdiction. While that may be an unauthorized exercise of power, this muddies the analysis of why compliance with a governmental directive does not violate the Utah Antitrust Act. The correct question is not whether the government directive was legally authorized, but whether the government and a private company colluded to restrain trade. When the government issues a directive and a private company complies with it, regardless of whether the directive is legally authorized, the logical presumption is that there was no agreement between the government and the private company in restraint of trade. Something more must be pled to rebut this presumption. We therefore affirm the district court's dismissal of this cause of action against Newfield for failure to state a claim.

## 2. Civil Conspiracy

¶70    In order to plead a claim for civil conspiracy, a complaint must allege sufficient facts to establish "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *Pohl, Inc. of America*, 2008 UT 89, ¶ 29 (citation omitted). Once again, Harvey has failed to plead sufficient facts to establish a meeting of the minds. At most, he has pled that a unilateral directive was issued by the Ute Tribe and that Newfield complied with it. To survive a motion to dismiss, Harvey must plead some kind of meeting of the minds between Newfield and the tribal officials to harm Harvey in an unlawful manner. Also, for the same reasons as noted above, we do not see how, absent something more, a conspiracy can be established between multiple private companies that are merely complying with a government order. We affirm the district court's dismissal of Harvey's claim for civil conspiracy against Newfield.

## 3. Tortious Interference with Economic Relations

¶71    Tortious interference with economic relations is established when the plaintiff proves: "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff."[18] *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553

---

[18] In *Eldridge* we abandoned the "for an improper purpose" prong of this second element. 2015 UT 21, ¶ 64.

(alteration in original) (citation omitted). This claim is an intentional tort, requiring Harvey to prove that Newfield had "a desire to bring about" the interference with Harvey's economic relationships. *Id.* ¶ 66. "To establish . . . improper means, a plaintiff must show 'that the defendant's means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession.'" *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 20, 116 P.3d 323 (citation omitted).

¶72 There is nothing improper in complying with a government directive. Indeed, just the opposite is true. Again, this does not foreclose the possibility that an adequate claim could be pled. If Newfield had bribed the tribal officials to send out the letter with the intent to shut down Harvey's businesses, this would perhaps be enough. But, as it stands, the complaint simply alleges that Newfield complied with the March 20th letter. This is not improper and we affirm the district court's dismissal of Newfield from this cause of action.

4. Extortion

¶73 Harvey brings a claim for extortion. Extortion is a crime in Utah, but we have never recognized a corresponding civil claim. *See* UTAH CODE § 76-6-406. "When a statute makes certain acts unlawful and provides criminal penalties for such acts, but does not specifically provide for a private right of action, we generally will not create such a private right of action." *Youren v. Tintic Sch. Dist.*, 2004 UT App 33, ¶ 4, 86 P.3d 771 (citing *Milliner v. Elmver Fox & Co.*, 529 P.2d 806, 808 (Utah 1974)), *cert. denied*, 94 P.3d 929 (Utah 2004). Our refusal to do so is "based on the long-standing approach to statutory interpretation that prevents courts from creating a private right of action '[w]hen a statute makes certain acts unlawful and provides criminal penalties for such acts, but does not specifically provide for a private right of action.'" *Puttuck v. Gendron*, 2008 UT App 362, ¶ 18, 199 P.3d 971 (alteration in original) (citation omitted). We see no reason to depart from this general rule here. We affirm the district court on alternative grounds and hold that there is currently no civil cause of action for extortion, and thus, there is no legal remedy. Because there is no remedy, Harvey has failed to show that he is entitled to relief. The creation of such a cause of action is a matter best left to the legislature. *Milliner*, 529 P.2d at 808 (refusing to create a civil remedy for conduct that is criminal under a statute, because "it is a matter best left to the legislature").

5. Blacklisting

¶74    Finally, we address Harvey's claim for blacklisting under Utah Constitution article XII, section 19 and article XVI, section 4. Article XII, section 19 states that "[e]ach person in Utah is free to obtain and enjoy employment whenever possible, and a person . . . may not maliciously interfere with any person from obtaining employment or enjoying employment already obtained . . . ." Article XVI, section 4 states that "[t]he exchange of black lists by . . . corporations, associations or persons is prohibited."

¶75    Newfield argues that there is no right to a private cause of action under article XVI, section 4 and article XII, section 19. A state constitutional provision creates a private cause of action when it is self-executing. *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 2000 UT 87, ¶ 7, 16 P.3d 533. A self-executing provision is one that, "[i]n essence, . . . can be judicially enforced without implementing legislation." *Id.* This means that the provision "articulates a rule sufficient to give effect to the underlying rights and duties intended by the framers." *Id.* (citation omitted). Thus, "courts may give effect to a provision without implementing legislation if the framers intended the provision to have immediate effect." *Id.* (citation omitted). We can determine that a provision was intended to have immediate effect when the provision is "both judicially definable and enforceable," even though its express language may be stated "in relatively general terms." *Id.* ¶ 12. A good indicator that the framers intended the provision to be self-executing is when the provision "prohibits specific evils that may be defined and remedied without implementing legislation." *Bott v. DeLand*, 922 P.2d 732, 737 (Utah 1996) *abrogated on other grounds by Spackman*, 2000 UT 87. "Conversely, constitutional provisions are not self-executing if they merely indicate a general principle or line of policy without supplying the means for putting them into effect." *Spackman*, 2000 UT 87, ¶ 7 (citation omitted).

¶76    Once a provision is shown to be self-executing, a plaintiff is entitled to equitable relief to remedy a violation of the constitutional provision. *Id.* ¶ 18; *Bott*, 922 P.2d at 737 ("[S]elf-executing provision[s] . . . traditionally allow[] courts to award injunctions and invalidate conflicting statutes . . . ."). However, "a self-executing constitutional provision does not necessarily give rise to a damages suit." *Spackman*, 2000 UT 87, ¶ 18. Thus, if a plaintiff seeks damages, he or she must argue that 1) "he or she suffered a 'flagrant' violation of his or her constitutional rights," 2) "existing remedies do not redress his or her injuries," and 3) "equitable relief,

such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries."[19] *Id*. ¶¶ 23–25.

¶77 Article XVI, section 7 states that "[t]he Legislature . . . shall provide for the enforcement of the provisions of this article," including section 4 of article XVI. This clearly indicates that the framers did not intend this provision to be self-executing. Rather, the rights expressed in article XVI must be protected through "appropriate legislation." Whether the legislature has actually passed legislation to protect a person's rights under article XVI, section 4, and what the remedy should be if it has failed to do so, is not before this court. We hold that article XVI, section 7 is not self-executing and that Harvey is not entitled to bring a private claim directly under that provision.

¶78 Article XII, section 19 originally stated that "[t]he Legislature shall provide by law for the enforcement of this section." *See* UTAH CONST. art. XII, § 19 (1896). Newfield argues that the court of appeals has already ruled that this provision is not self-executing based on this language. *See Richards Irrigation. Co. v. Karren*, 880 P.2d 6, 10–11 (Utah Ct. App. 1994). Again, this language clearly indicated that the framers did not intend the provision to be self-executing.

---

[19] Newfield argues that Harvey failed to preserve this argument below, but this conflates the two standards. If a constitutional provision is self-executing, a private claim may be brought under the provision for equitable relief. While Harvey never specifically said, "self-executing" in his arguments below or in his opening brief on appeal, his substantive arguments address this issue and it is therefore preserved.

Harvey, however, undoubtedly failed to preserve an argument that, under these three factors, he is entitled to damages. But the three factors in *Spackman* only determine whether money damages are available, not whether a cause of action exists. Harvey sought injunctions and declaratory judgments in addition to his claim for money damages. His request for equitable relief should not be dismissed as long as the constitutional provisions are self-executing, even if these elements for money damages are not met. Thus, at worst, his failure to argue these elements on a motion to dismiss would result in dismissal of his request for money damages under these constitutional causes of action. We do not reach this issue because we dismiss his constitutional claims against Newfield on other grounds.

But this language was removed on January 1, 1993, abrogating the court of appeals holding and re-opening this issue. *Id.* at 11 n.2; S.J. Res. 7, 49th Leg., Gen. Sess. (Utah 1992).

¶79    We do not reach this issue, however, because even if this provision is self-executing, Harvey has failed to state a claim against Newfield. This provision states that a person "may not *maliciously* interfere with any person from obtaining employment or enjoying employment already obtained." UTAH CONST. art. XII, § 19 (emphasis added). Malice implies some kind of "hostility or ill will," or intent to commit a wrongful act. *Cox v. Hatch*, 761 P.2d 556, 559 n.1 (Utah 1988); *Malice*, BLACK'S LAW DICTIONARY (8th ed. 2004) ("The intent, without justification or excuse, to commit a wrongful act."). Harvey has not pled that Newfield maliciously intended to harm Harvey, and no inference of malice can be made from the facts pled. Harvey merely pled that Newfield received and complied with a government directive from the Ute Tribe. This is not enough to show hostility, ill will, or an intent to commit a wrongful act. We affirm the district court's dismissal of this claim against Newfield under rule 12(b)(6).

¶80    We affirm the district court's dismissal of D. Ray. C. Enterprises, LaRose Construction, and Newfield for failure to state a claim upon which relief can be granted because Harvey pled causes of action that do not exist, and because he failed to plead adequate facts against those defendants supporting the causes of action that do exist. While we dismiss all of Harvey's state law claims against these three defendants, we do not address his state law claims against the remaining defendants under Utah Rule of Civil Procedure 12(b)(6).

## CONCLUSION

¶81    The Ute Tribe has not clearly waived its sovereign immunity and we affirm the district court's dismissal of the tribe for lack of subject matter jurisdiction. We also affirm the district court's dismissal of LaRose Construction Company, Inc., D. Ray C. Enterprises, LLC, Newfield Production Company, Newfield Rocky Mountains, Inc., Newfield RMI, LLC, and Newfield Drilling Services, Inc. for failure to state a claim upon which relief can be granted. We vacate the district court's dismissal of the remaining defendants for failure to join an indispensable party and we remand for the district court to determine whether the case should be dismissed or stayed under the tribal exhaustion doctrine. If the district court decides to stay proceedings, Harvey's state law claims against Dino Cesspooch, Jacki LaRose, and Sheila Wopsock in their individual capacities, and against L.C. Welding & Construction,

Scamp Excavation, and Huffman Enterprises, Inc., survive. Harvey's two federal claims that the tribal officials exceeded the scope of the Ute Tribe's jurisdiction and seeking injunctions also survive.

———————

JUSTICE HIMONAS, concurring:

¶82    I concur in Justice Durham's opinion without reservation. I write separately to more fully explain why, in my view, the tribe is not a necessary party under rule 19(a) of the Utah Rules of Civil Procedure and to offer some practical guidance to the district courts on how to manage a dual-capacity suit like this one. I also write separately to lay out why I believe the tribal exhaustion doctrine applies to state courts and why it is a rule of exhaustion and not abstention. Last, I write separately to identify a jurisdictional issue the district court and the parties should take up on remand.

## I. RULE 19 IN THE CONTEXT OF DUAL CAPACITY SUITS

¶83    The plaintiffs have sued certain tribal officials—Dino Cesspooch, Jacki LaRose, and Sheila Wopsock—in their individual and official capacities. The individual-capacity claims seek money damages and the official-capacity claims seek prospective injunctive relief requiring these tribal officials, acting in their official capacity, to forebear from interfering in certain respects with the plaintiffs' business activities.

¶84    I agree with the majority that, to the extent the plaintiffs' official-capacity suit seeks a prospective injunction enjoining the tribal officials from violating federal (as opposed to tribal) law, the plaintiffs have stated a valid claim under *Ex parte Young*, 209 U.S. 123 (1908), that is not barred by sovereign immunity. I also agree with the majority that the Ute Tribe's absence from this suit will not "impair or impede [its] ability to protect [its] interest" because the tribal officials, acting in their official capacity, may be presumed to adequately represent the interests of the tribe. *Supra* ¶¶ 34–36. And the majority is correct that "[t]here is no argument that the tribal officials [acting in their official capacities] will do anything antithetical to the interests of the tribe or that they will fail to make any 'reasonable argument that the tribe would make if it were a party.'" *Supra* ¶ 38 (quoting *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1180 (9th Cir. 2012)). Consequently, the tribe need not be joined under rule 19(a)(2)(i) of the Utah Rules of Civil Procedure. While the tribe surely has "an interest related to the subject of the action"—an interest in ensuring that it may regulate business activities on the reservation to the fullest extent allowed by federal law—it is not "so situated that the disposition of the action in [its] absence . . . may as a practical matter impair or impede [its]

ability to protect that interest" because the tribal officials will fully represent its interests. UTAH R. CIV. P. 19(a)(2)(i).[1]

¶85　I write separately to more fully show our math under rule 19(a)(2)(i). While foundational principles establish that sovereigns are not necessary parties to officer suits under *Ex parte Young*, neither the majority opinion nor the authority it cites fully explains why we can state, with absolute confidence, that the tribal officials will fully represent the interests of the tribe. It is certainly not because the tribal officials will necessarily have the tribe's best interests at heart in the individual-capacity damages suits against them. To the contrary, "a person sued in his official capacity has no stake, as an individual, in the outcome of the [official-capacity] litigation," and therefore does not necessarily have an incentive to vigorously defend in that litigation. *Johnson v. Bd. of Cty. Comm'rs of Fremont*, 85 F.3d 489, 493 (10th Cir. 1996) (citation omitted). In addition, "[t]he distinctions between suits against an official in his individual and official capacities [can] give rise to differing and potentially conflicting defenses." *Id.*

¶86　The reason we are right to be confident that the tribal officials will fully represent the interests of the tribe is that an *Ex-parte-Young*-style suit for prospective injunctive relief against tribal officials is not really a suit against the tribal officials at all. As the majority explains, in official-capacity suits "the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself." *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017) (citation omitted). Indeed, "official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citation omitted). They "rest[] on the 'obvious fiction' that [a suit for prospective injunctive relief against sovereign officials] is not really against the [sovereign], but rather against an individual who has been 'stripped of his official or representative character' because of his unlawful conduct." *Va. Office for Prot. & Advocacy v. Stewart*, 563

---

[1] A person is also necessary under rule 19 "if in the person's 'absence complete relief cannot be accorded among those already parties' . . . [or] the person . . . claims an interest in the action and her absence would 'leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations.'" *Supra* ¶ 35 (quoting UTAH R. CIV. P. 19(a)(1) & (2)(ii)). I have no concerns with the majority's analysis of these two prongs of rule 19(a).

U.S. 247, 267 (2011) (citations omitted). But because it is a "fiction" that *Ex-Parte-Young*-style suits run against the government official, as opposed to the government entity itself, they should in reality "be treated as suits against the [government entity]." *Hafer*, 502 U.S. at 25 (citation omitted).

¶87 Here, this means that the tribal officials, as individuals, should have no personal control over the course of the official-capacity litigation. Instead, even though the tribal officials are the nominal defendants in the official-capacity suit, "the *government entity* [must] receive[] notice and an opportunity to respond." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (emphasis added) (citation omitted). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the [government] entity," not the individual tribal official. *Id.* (citation omitted) Thus, except where the government entity that is the real party in interest might, itself, take a position "antithetical to the interests of the tribe," the obvious potential conflict between the officials in the individual-capacity suit and the government entity those same officials represent in their official capacity should not pose a problem. *See Salt River*, 672 F.3d at 1181. And, of course, if the tribal officials leave office during the pendency of this action, the plaintiffs' *Ex-parte-Young*-style suit "may be continued and maintained . . . against [their] successor[s], if within 6 months after the successor takes office, it is satisfactorily shown to the court that there is a substantial need for so continuing and maintaining it." UTAH R. CIV. P. 25(d).

¶88 This explanation for why the tribe need not be joined under rule 19(a)(2)(i) has implications for how this lawsuit should proceed in the event that it remains or returns, in whole or in part, to the district court. First, even though all of the claims against the tribe itself have been dismissed because of the tribe's sovereign immunity, the underlying tribal entity against which the plaintiffs are seeking their injunction—be that the tribe itself or the Ute Tribal Employment Rights Office—must continue to receive notice and an opportunity to be heard. *Graham*, 473 U.S. at 166.

¶89 Second, in the event that the tribal officials end up represented by the same counsel in both their official and individual capacities, the district court and all counsel should be on the lookout for potential conflicts of interest in this dual representation. *See Johnson*, 85 F.3d at 493 ("Given the potential conflict between the defenses available to a government official sued in his individual and official capacities, we have admonished that separate representation for the official in his two capacities is a 'wise precaution.'" (citation omitted)); *see also Galvin v. Lloyd*, 663 F. Supp. 1572, 1581 (D. Conn.

1987) ("[J]oint representation in [dual-capacity] suits sometimes creates a potential conflict of interest because different theories of liability and defenses may be applicable under each capacity.").

¶90     In this regard, I note with approval that, at least for a time, the tribal officials were represented by the tribe's counsel in the official-capacity suit and by personal counsel in the individual-capacity suit. This is a good practice that is too often neglected in dual capacity suits such as the one before us. *Cf.* Dina Mishra, Note, *When the Interests of Municipalities and Their Officials Diverge: Municipal Dual Representation and Conflicts of Interest in § 1983 Litigation*, 119 YALE L.J. 86, 90 (2009) ("[D]espite their importance, conflicts of interest in . . . dual representation [lawsuits] are 'frequently overlooked by litigants' . . . and the issue 'has received scant attention in appellate opinions.'" (citation omitted)).

## II. THE MAJORITY'S EXHAUSTION ANALYSIS

¶91     I now turn to the majority's articulation and application of the tribal exhaustion rule. I agree with the majority that our court must abstain from hearing this case until the plaintiffs have exhausted available tribal remedies. In my view, the tribal exhaustion rule applies whenever a tribal court has a colorable claim of jurisdiction. *See, e.g.*, *Stock W. Corp. v. Taylor*, 964 F.2d 912, 919 (9th Cir. 1992) (en banc) (tribal exhaustion rule requires court to stay hand whenever "the record presents a colorable question" whether tribal court has jurisdiction); *Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation*, 862 F.3d 1236, 1243 (10th Cir. 2017) (tribal exhaustion rule applies "so long as tribal courts can 'make a colorable claim that they have jurisdiction'" (citation omitted)). Whether a tribal court has a colorable claim of jurisdiction over a nonmember's civil action turns on whether there is a colorable argument that the tribe could exercise regulatory authority over the subject matter of the dispute. *Strate v. A-1 Contractors*, 520 U.S. 438, 447, 453 (1997). And whether a tribe could exercise regulatory authority over the subject matter of the dispute turns on application of the *Montana v. United States* exceptions to the general rule that "Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation." *Id.* at 446. Those exceptions are: (1) "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements," *Montana v. United States*, 450 U.S. 544, 565 (1981) (citations omitted), and (2) "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some

direct effect on the political integrity, the economic security, or the health or welfare of the tribe," *id.* at 566 (citations omitted). In my view, the majority is correct that, at bottom, the plaintiffs' lawsuit centrally involves the exercise of the tribe's regulatory authority over the activities of nonmembers who engage in consensual commercial relationships with the tribe or its members—and it therefore falls within the first *Montana* exception to the general rule that tribes lack regulatory or adjudicatory jurisdiction over nonmembers in connection with their off-reservation conduct. *See supra* ¶¶ 42–52 & n.11.

¶92    I write separately to (1) explain why I believe the tribal exhaustion doctrine applies in state court, (2) explain why I believe the tribal exhaustion doctrine is an *exhaustion* doctrine, not an abstention doctrine, and (3) flag an additional jurisdictional issue that the district court should explore on remand.

*A. The Tribal Exhaustion Doctrine*
*Applies in State Courts*

¶93    I agree with the majority that the tribal exhaustion rule applies in state court as well as federal court. The United States Supreme Court has explained that the tribal exhaustion rule applies to "*any* nontribal court." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 (1987) (emphasis added); *see also Nevada v. Hicks*, 533 U.S. 353, 398 (2001) (O'Connor, J., concurring) (tribal exhaustion rule determines "the relationship between tribal courts *and state* and federal courts." (emphasis added)). This is because the tribal exhaustion rule is an "interstitial and court-created . . . component of the law embodying the federal policy supporting tribal self-government and self-determination" that is therefore binding on the states under the Supremacy Clause. *Drumm v. Brown*, 716 A.2d 50, 62–63 (Conn. 1998).

¶94    I recognize that some courts have concluded that the tribal exhaustion rule is not binding on the states. In *Astorga v. Wing*, for example, the Arizona Court of Appeals reasoned that the tribal exhaustion rule might not apply to state courts because "[u]nlike . . . state courts, federal courts retain the power to review an Indian court's exercise of jurisdiction over non-members." 118 P.3d 1103, 1106 (Ariz. Ct. App. 2005) (citation omitted). Because imposing the tribal exhaustion rule on state courts would oust them from any opportunity to ensure that tribal courts properly apply state law, *Astorga* reasoned, this result cannot be what Congress intended. *Id.* at 1107–09.

¶95    In my view, these courts' analysis cannot be squared with the express language in *LaPlante*. *Supra* ¶ 93. It is also inconsistent

with fundamental principles of Indian law as well as the policy that, according to the United States Supreme Court, undergirds the tribal exhaustion doctrine.

¶96    First, the notion that the tribal exhaustion rule does not apply to state courts is inconsistent with fundamental principles of Indian law. "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." *Rice v. Olson*, 324 U.S. 786, 789 (1945) (citing *Worcester v. Georgia*, 31 U.S. 515 (1832), *abrogation recognized by Nevada v. Hicks*, 533 U.S. 353 (2001)). Congress has expressed its preference for limiting state control over Indian affairs in statutes including the Indian Child Welfare Act (which imposes a variety of limits on and federal oversight of state exercises of jurisdiction over Indian children in adoption proceedings), 25 U.S.C. §§ 1901 through 1963, and the Major Crimes Act (which gives exclusive jurisdiction to federal courts to adjudicate major crimes perpetrated in Indian country by one Indian against another), 18 U.S.C. § 1153.

¶97    In light of these background principles, it would be anomalous to conclude that the tribal exhaustion rule only applies in federal court. The effect of this ruling would be to place state courts in a superior position to federal courts in hearing cases that implicate tribal jurisdiction. Conceivably, given the general rule that state and federal courts have concurrent subject matter jurisdiction, *Robb v. Connolly*, 111 U.S. 624, 636 (1884), this might give rise to a scheme where plaintiffs overwhelmingly chose to litigate in state court instead of tribal court—a state of affairs that would wholly subvert the federal policy of encouraging the development of tribal court systems, *see El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 484 (1999) (rooting the tribal exhaustion doctrine in Congress's "policy of supporting tribal self-government" (citation omitted)); *see also LaPlante*, 480 U.S. at 15 (exhaustion rule is rooted in the federal policy of "[p]romot[ing] . . . tribal self-government and self-determination").[2]

---

[2] To be sure, defendants in such suits could conceivably remove to federal court and then seek application of the tribal exhaustion rule. *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14–16 (1987) (tribal exhaustion rule applies to diversity proceedings). But this underscores the logic of applying the tribal exhaustion rule in state courts. It makes little sense to impose the extra procedural hurdle of removal in order to reach the same result—stay of nontribal

(continued . . .)

¶98     This brings me to my second point, which is that the policy underlying the tribal exhaustion rule supports the proposition that it applies in state court. As I have just explained, the purpose of the tribal exhaustion rule is to advance a policy of supporting "tribal self-government and self-determination." *LaPlante*, 480 U.S. at 15. The United States Supreme Court has clarified that the predominant, if not sole, policy underlying the tribal exhaustion requirement is the proposition that "[e]xhaustion [is] appropriate . . . because 'Congress is committed to a policy of supporting tribal self-government.'" *Neztsosie*, 526 U.S. at 484 (citation omitted). When a state court assumes control over litigation that could also proceed in tribal court it has the exact same effect on tribal self-determination as when a federal court assumes such control—in both instances, the federal policy of "encourag[ing] the[] development. . . . [of] [t]ribal courts" is subverted. *LaPlante*, 480 U.S. at 14–15. Because the policy underlying the tribal exhaustion rule admits of no distinction between federal and state courts, I conclude that the tribal exhaustion doctrine applies to state courts to the same extent it applies to federal courts.

¶99     The dissent dismisses these policies as "generalities" that should not ultimately inform our analysis of the tribal exhaustion doctrine. The dissent thinks that because the Supreme Court has not directly spoken to whether the tribal exhaustion doctrine applies to state courts, it is up to us to enact our own preferences about "how to balance the needed deference to sovereignty and the jurisdiction of the tribal courts." *Infra* ¶ 128.

¶100   The dissent then draws on other generalities, such as the generality that "[e]xhaustion . . . is a principle that regulates the timing of proceedings in tribunals that operate in a hierarchical relationship," to analogize the tribal exhaustion doctrine to, for example, the requirement to exhaust administrative remedies. *Infra* ¶

---

(continued . . .)
proceedings under the tribal exhaustion doctrine. Moreover, there will presumably remain some nonremovable cases filed in state court to which the tribal exhaustion rule would uncontroversially apply in federal court. But there is no reason to think such cases are less worthy of tribal exhaustion than removable cases. So declining to apply the tribal exhaustion rule to this random subset of cases would ultimately work an arbitrary, and therefore unacceptable, result. And most importantly, this purpose would be frustrated by a scheme that relies on litigants to remove to federal court to trigger the tribal exhaustion rule.

121. It then urges that we independently balance jurisdictional and sovereignty considerations to arrive at our own approach to the state-tribal relationship. *Infra* ¶¶ 128–29.

¶101   The dissent's analysis misunderstands our role *vis-à-vis* the United States Supreme Court. When we interpret federal law, we should not look to whether there is any "controlling statute or binding precedent" that stands in the way and then, if there is not, proceed to balance the interests involved in the case as we think best. *Cf.* Adam Liptak, *An Exit Interview With a Judicial Firebrand*, N.Y. TIMES, Sept. 12, 2017, at A18 (noting former Judge Richard Posner's view that the role of a court is to decide for itself what the sensible resolution of a dispute is and then reach that resolution unless "a recent Supreme Court precedent or some other legal obstacle [stands] in the way of ruling in favor of that sensible resolution"). Instead, we should strive to resolve the federal question before us in a way that is faithful to, and coheres with, operative federal principles, policies, and pronouncements. *Cf. Willis v. Aiken*, 8 F.3d 556, 565 (7th Cir. 1993) (lower courts interpreting federal law are "bound not only by the letter but by the spirit of the doctrines of stare decisis and precedent"); *Application of Johnston*, 502 F.2d 765, 774 (C.C.P.A. 1974) (Rich, C. J., dissenting) ("Under our judicial system, it is the duty of a judge of a lower court to try to follow in spirit decisions of the Supreme Court—that is to say, their 'thrust'."), *judgment reversed by Dann v. Johnston*, 425 U.S. 219 (1976).

¶102   Thus, there is no cause to dismiss as "generalities" the policies on which I draw. Nor should we ignore the Supreme Court's pronouncement—dicta though it may be—that the tribal exhaustion rule applies to "any nontribal court." *LaPlante*, 480 U.S. at 16. Instead, drawing on these policies and pronouncements, we should think critically and sympathetically about what result they support in this case. In my view, the federal policies on which I draw—which explicitly and implicitly aim at encouraging tribal self-government and self-determination and protecting tribal sovereignty—support extension of the tribal exhaustion rule to state courts.

¶103   I also disagree with the dissent's observation that because "exhaustion" (at least considered at a high level of generality) implies a "hierarchical relationship," the tribal exhaustion rule cannot be understood to apply in state courts. Respectfully, this analysis is insensitive to the Indian tribes' unique status and history—a status and history that should inform how we construe legal terms imported from other areas of law into the Indian law context.

¶104   Unlike administrative agencies, or even states, tribes are not subordinates in our constitutional hierarchy. They are "domestic dependent nations." *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991) (citation omitted). This means that, while they are subject to Congress's plenary control, "they remain 'separate sovereigns pre-existing the Constitution.'" *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014) (citation omitted). And while Congress's powers over Indian affairs are plenary, it is well-established that "[u]nder a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of [The U.S. Supreme] Court, [Congress] has charged itself with moral obligations of the highest responsibility and trust" toward these sovereigns. *Seminole Nation v. United States*, 316 U.S. 286, 296–97 (1942) (footnote omitted).

¶105   Thus, just as we are, in a sense, fiduciaries of Congress and the United States Supreme Court when interpreting federal law, *supra* ¶ 101, so does well-established federal law make us, in a sense, fiduciaries of the tribes. Federal policy is to respect and protect the tribes' pre-constitutional sovereignty. And this understanding of tribal sovereignty—and Congress's relationship to the tribes— informs my understanding of the tribal exhaustion doctrine. In light of the tribes' inherent sovereignty, I resist any construction of the tribal exhaustion doctrine on which it implies that tribes, like administrative agencies, occupy a subordinate role in a hierarchy. Instead, I believe it is proper to emphasize the other—dominant— theme in the Supreme Court's exhaustion jurisprudence: the policy of encouraging the development of tribal judicial institutions, the better to facilitate the discharge of the Federal Government's "humane and self imposed policy" in favor of facilitating tribal self-government and self-determination. *Seminole Nation*, 316 U.S. at 296.

*B. The Tribal Exhaustion Rule Is a Rule of Exhaustion, Not Abstention*

¶106   For many of the reasons I think the tribal exhaustion rule applies in state court, I also agree with the majority that the rule is a rule of *exhaustion*, not abstention. The practical difference between a tribal exhaustion rule and a tribal abstention rule is that, if the rule were one of abstention, courts would likely be called upon to balance multiple factors, including judicial economy concerns and the avoidance of piecemeal litigation. *See, e.g.*, *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976) [hereafter *Colorado River*] ("In assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction [by a state court], a federal court may . . . consider such factors as the inconvenience of the federal forum, . . . the desirability of avoiding piecemeal

litigation, . . . and the order in which jurisdiction was obtained by the concurrent forums." (citations omitted)). If, on the other hand, the rule requires exhaustion, then state courts need not take broad concerns of judicial economy into account in deciding whether to stay their hand.

¶107 I think the tribal exhaustion rule does, indeed, require exhaustion. The Supreme Court has consistently described the doctrine as a rule of exhaustion, not abstention, and it has never indicated that courts should apply a multifactorial, abstention-style balancing test to determine when exhaustion is appropriate. *See Neztsosie*, 526 U.S. at 483 (describing "doctrine of tribal-court exhaustion"); *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856–57 ("[e]xhaustion of tribal court remedies" is rooted in the "policy of supporting tribal self-government and self-determination"); *see also LaPlante*, 480 U.S. at 16 (discussing "the exhaustion rule announced in *National Farmers Union*"). Moreover, it has stated the rule in categorical terms; "comity *requires* that tribal remedies be exhausted before district court considers issue of tribal court jurisdiction." *Granberry v. Greer*, 481 U.S. 129, 131 n.4 (1987) (emphasis added) (citing *Nat'l Farmers Union*, 471 U.S. 845).

¶108 Additionally, as I have already explained, the exhaustion requirement is rooted in the congressional policy in favor of promoting the development of tribal courts and tribal self-government and self-determination. *Supra* ¶¶ 96–101.[3] It is therefore

---

[3] In the dissent's view, requiring litigants, including Indian litigants, to file in tribal court does not "respect their right of self-governance"; it "overrid[es] it." *Infra* ¶ 142. This is ultimately just a quip—it trades on an ambiguity in the notion of "self-governance." The "self-governance" that the tribal exhaustion doctrine seeks to promote is the self-governance that comes from encouraging the development of tribal judicial institutions; it is not the policy of allowing litigants to choose their own forum. *See, e.g., Smith v. Moffett*, 947 F.2d 442, 444 (10th Cir. 1991) ("The fact that Smith apparently has not yet presented his case to a tribal court does not diminish the comity considerations present in this case."); *Wellman v. Chevron U.S.A., Inc.*, 815 F.2d 577, 579 (9th Cir. 1987) (declining to allow Indian plaintiff to file suit in federal district court, instead of tribal court, because both Indian and non-Indian plaintiffs are "limited to tribal court as the forum of first recourse"). In any event, by seeking to dismiss this action on the basis that the plaintiffs have not exhausted their tribal remedies, the Indian defendants here *have*

(continued . . .)

unlike the *Colorado River* abstention doctrine that otherwise applies when federal courts are considering whether to stay their hand in a matter over which different United States court systems have concurrent jurisdiction.

> The tribal exhaustion doctrine is in no way based on *Colorado River.* . . . [T]he *Colorado River* doctrine "proceeds from the premise that 'the federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given to them"'" and . . . therefore, the pendency of litigation in state court is not a bar to proceedings in federal court involving the same subject matter in the absence of "exceptional circumstances." The policy which animates the tribal exhaustion doctrine, however, "subordinates the federal court's obligation to exercise its jurisdiction to the greater policy of promoting tribal self-government." *Colorado River* abstention is thus the exception to the rule, whereas tribal exhaustion is the rule rather than the exception.

*Bank One, N.A. v. Shumake*, 281 F.3d 507, 514–15 (5th Cir. 2002) (third alteration in original) (citation omitted). Because the Supreme Court calls the tribal exhaustion rule an "exhaustion rule," and because the Court has not incorporated the *Colorado River* factors into that rule, I conclude that it is, indeed, a rule of exhaustion that requires state and federal courts to give tribal courts the first crack at cases colorably falling within their jurisdiction.

### C. Ute Tribal Law and the Jurisdiction of Courts of the Ute Indian Tribe

¶109  Finally, I flag an issue for the district court to explore on remand. The majority is correct to remand this case to the district court. *Supra* ¶ 81. And the majority is also correct that the district court, on remand, has discretion to either stay the action before it or dismiss the plaintiffs' complaint without prejudice, to give the plaintiffs an opportunity to first file their suit in tribal court. *Supra* ¶ 81.

---

(continued . . .)
expressed their preference for having this dispute adjudicated in available tribal forums. *Memorandum in Support of Motion to Dismiss by Tribe and UTERO Officials* at 13–14.

¶110   In the course of deciding whether a stay or dismissal is more appropriate, the district court may wish to explore whether the plaintiffs have any nonfrivolous basis for filing a subset of their claims—their official-capacity claims—in tribal court. At first blush (and perhaps even in the final analysis), the Ute Law and Order Code appears to bar the tribe's courts from exercising jurisdiction over "claims against . . . any Tribal officers or employees in their official capacities" in circumstances such as the ones at issue in this lawsuit. UTE LAW & ORDER CODE § 1-2-3(5).[4] While there may be an argument that this provision—which falls under the "personal jurisdiction" section of the Law and Order Code—does not apply as its plain language suggests, its plain language raises the possibility that no reasonable plaintiff could in good faith file such a claim in Ute Tribal Court.

¶111   To be sure, complaints must first be filed in tribal court whenever there is a colorable argument that the tribal court may have jurisdiction. *Norton*, 862 F.3d at 1243 (tribal exhaustion rule applies "so long as tribal courts can 'make a colorable claim that they have jurisdiction.'" (citation omitted)). And our courts should be particularly hesitant to find no colorable claim of tribal jurisdiction based on an interpretation of a tribal code (as opposed to federal jurisdictional law). *See Basil Cook Enters., Inc. v. St. Regis Mohawk Tribe*, 117 F.3d 61, 66 (2d Cir. 1997) (declining "to hold that the St. Regis Mohawk Tribal Court is a nullity under the tribal constitution" because "courts, as a general matter, lack competence to decide matters of tribal law and for us to do so offends notions of comity underscored in *National Farmers*"). But nor should anything in our opinion today be taken to require a plaintiff to file a frivolous complaint. *Cf.* UTAH R. PROF'L CONDUCT 3.1 (lawyers have an ethical obligation not to bring frivolous claims); *see also Nat'l Farmers Union*, 471 U.S. at 856 n.21 (exhaustion not required if assertion of tribal

---

[4] I accessed the Ute Law and Order Code through the Native American Rights Fund's National Indian Law Library. NARF's website indicates that the code was last amended in 2013, but it also includes, as a disclaimer, that while "every effort is made to present current and accurate information, if you need an official version of the tribe's laws, please contact the tribe." NATIVE AMERICAN RIGHTS FUND, http://www.narf.org/nill/codes/ute_uintah_ouray/ [https://perma.cc/8YXR-4HLZ]. The district court may wish to verify that section 1-2-3(5) is contained in the current, operative version of the Law and Order Code.

jurisdiction is in bad faith or "patently violative of express jurisdictional prohibitions").

¶112 I acknowledge that some courts have held that under *National Farmers Union*'s "patently violative of express jurisdictional prohibitions" exception, "the only relevant 'jurisdictional prohibitions' . . . are those arising under federal law" on the basis "that construction of tribal law is 'solely a matter within the jurisdiction of the tribal courts.'" *Basil Cook Enters.*, 117 F.3d at 67 (quoting *Talton v. Mayes*, 163 U.S. 376, 385 (1896)). Equally, I recognize that courts have held that "a federal court must look to the conduct of the [tribal] court itself, rather than the parties, in assessing bad faith" under *National Farmers*' "bad faith" exception to the tribal exhaustion rule. *Acres v. Blue Lake Rancheria*, No. 16-cv-05391, 2017 WL 733114, at *2 (N.D. Cal. Feb. 24, 2017) (citing *Grand Canyon Skywalk Dev., LLC v. 'sa' Nyu Wa Inc.*, 715 F.3d 1196, 1201 (9th Cir. 2013)). These opinions underscore my view that the district court must take great pains to ensure that there is no nonfrivolous basis for asserting a particular claim in tribal court before it may retain control of that claim. But I remain convinced that the tribal exhaustion doctrine cannot require a plaintiff to file a truly frivolous claim in tribal court—including a claim that the tribe's own law expressly and unambiguously precludes.

¶113 On remand, therefore, I believe it would be prudent for the district court to request briefing from the parties—including the tribal officials—on whether there is any reason to think that the tribe's courts could assert jurisdiction over the plaintiffs' official-capacity claims. If a nonfrivolous argument could be made that the tribe's courts have jurisdiction over official-capacity claims, then those claims must first be brought in tribal court. *See Stock W. Corp.*, 964 F.2d at 920 (holding that whether a provision of the Colville Law and Order Code applies to bar a particular claim "is a matter that requires an interpretation of legislative intent that should be conducted in the first instance by the Colville tribal courts"). If not, then the district court should consider retaining jurisdiction over the official-capacity claims, and perhaps stay them pending resolution of those portions of the plaintiffs' lawsuit that can proceed in tribal court.

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and dissenting in part:

¶114   The majority does an admirable job of bringing order and clarity to a complex case. I agree with and concur in most of the majority opinion and in Justice Himonas's concurrence. Our only point of disagreement stems from their analysis relating to tribal exhaustion and their conclusions affected by that analysis. Unlike the majority and concurrence, I find no basis in federal law for a rule forcing the plaintiffs to "exhaust" their claims by filing suit in tribal court. No party to this case has ever sought to invoke the jurisdiction of the tribal courts. The plaintiffs chose this forum and the defendants apparently agree—they have not initiated a declaratory proceeding in tribal court. And I see no basis for the court's decision to override the parties' choice of this Utah forum.

¶115 The U.S. Supreme Court has imposed an exhaustion requirement in a line of cases in which (a) one of the parties has invoked the jurisdiction of the tribal courts and (b) another party has filed suit *in federal court* (which retains appellate jurisdiction over the tribal court). *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9 (1987); *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985). But there is no binding authority extending the exhaustion requirement to a case like this one, in which neither of these elements is met. And I would not adopt such a requirement here.

¶116 Our system yields to parties the general prerogative of choosing an appropriate forum.[1] When the parties file suit in a court that has both subject-matter jurisdiction over the dispute and personal jurisdiction over the parties, our courts have a general duty to exercise that jurisdiction.[2] This is no arbitrary rule. It is a core premise of our judicial system—a premise aimed at protecting the

---

[1] *See Energy Claims Ltd. v. Catalyst Inv. Grp. Ltd.*, 2014 UT 13, ¶¶ 30, 33, 325 P.3d 70 (recognizing that "[a]s a general matter, a plaintiff's choice of forum is entitled to deference" so long as the plaintiff's choice of forum "was motivated by legitimate reasons"); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981) ("[T]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum . . . .").

[2] *See Piper Aircraft Co.*, 454 U.S. at 255 (agreeing "that a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum") (citing *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 831–32 (1947)).

federal constitutional right to due process and the state constitutional right to open access to court. U.S. CONST. amend. V; UTAH CONST. art. I, § 11.

¶117  These general rules are subject to exceptions. One exception is set forth in the above-cited cases. These cases establish a requirement of exhaustion as a matter of federal Indian law—a rule that "directs a federal court to stay its hand" in the face of a pending tribal court action "in order to give the tribal court a 'full opportunity to determine its own jurisdiction.'" *LaPlante*, 480 U.S. at 16 (quoting *Nat'l Farmers Union*, 471 U.S. at 857). This requirement, however, has never been extended to a case like this one. And I see no reason to do so.

¶118 For reasons set forth below I would not hold that the exhaustion rule announced by the U.S. Supreme Court extends to cases in which the parties are litigating their differences in state court and no party has yet invoked the jurisdiction of a tribal court. First, I see no basis for the conclusion that the principles set forth in *LaPlante* apply with equal force in a case involving the interplay between tribal courts and state courts. Second, and in any event, I see no basis for extending the *LaPlante* doctrine of exhaustion to a case in which there is no pending proceeding in the tribal forum. In the absence of a binding federal rule I would approach the question presented as a matter of comity addressed to our common law authority.[3] And under that authority I would conclude that our courts should stay our exercise of jurisdiction only *after* one of the parties has invoked the jurisdiction of the tribal courts.

---

[3] My difference with my colleagues has nothing to do with one or the other of us "misunderstand[ing]" our relationship with the United States Supreme Court. *See supra* ¶ 101. I think we all understand this relationship quite well. We just read the relevant precedent differently.

Like my colleagues, I embrace the duty to be "faithful" to the "operative federal principles" set forth in governing Supreme Court precedent. *See supra* ¶ 101. Yet I do not think the principle of exhaustion set forth in *LaPlante* and *National Farmers Union* applies with equal force in a case involving the interplay between tribal courts and state courts. And because I find the comity considerations implicated in a case like this one to be quite distinct from those addressed by the court in these cases, I think it falls to us to decide the question presented.

I

¶119 I find no basis in federal law for a rule of exhaustion that is binding on state courts. A few lower courts have held that the logic and some dicta in *LaPlante* and *National Farmers Union* suggest that the exhaustion principle ought to extend to state court proceedings.[4] But the U.S. Supreme Court has never considered the question before us.[5] Its cases, to date, have all involved the interplay between actions filed in federal court and competing cases filed in tribal court.[6]

¶120 Justice Himonas cites *Nevada v. Hicks*, 533 U.S. 353 (2001), and *LaPlante*, 480 U.S. at 16, for the proposition that the U.S. Supreme Court's "tribal exhaustion rule" governs "'the relationship between tribal courts *and state* and federal courts.'" *Supra* ¶ 93 (quoting *Hicks*, 533 U.S. at 398). But the cited language from *Hicks* comes from Justice O'Connor's concurring opinion. And neither case is addressed to the question of relevance here—of whether federal law requires state courts to stay their hand in anticipation of a tribal court proceeding

---

[4] *Drumm v. Brown*, 716 A.2d 50, 62–63 (Conn. 1998) (suggesting that the exhaustion doctrine, inseparable from the policy of deference to tribal courts, is an interstitial rule of federal common law, which is binding upon state courts under the Supremacy Clause; concluding that the exhaustion doctrine is binding on state courts because states are equally likely to disrupt the "federal policy supporting tribal self-government"); *contra Meyer & Assocs. v. Coushatta Tribe of La.*, 992 So. 2d 446, 450 (La. 2008) (refusing to apply the doctrine of exhaustion in the context of a state court proceeding); *Astorga v. Wing*, 118 P.3d 1103, 1106 (Ariz. Ct. App. 2005) (finding that the exhaustion rule did not apply to state courts because federal courts have the ability to review these determinations, whereas state courts do not).

[5] *See Meyer & Assocs.*, 992 So. 2d at 450 (noting that "[t]he United States Supreme Court has never held that the exhaustion of tribal remedies doctrine applies to the states").

[6] *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856 (1985) (asserting that "the forum whose jurisdiction is being challenged [shall have] the first opportunity to evaluate the factual and legal bases for the challenge"); *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 (1987) (emphasizing the need to avoid "direct competition with the tribal courts"); *Strate v. A-1 Contractors*, 520 U.S. 438, 448 (1997) (summarizing U.S. Supreme Court precedent as establishing "an exhaustion rule allowing tribal courts initially to respond to an invocation of their own jurisdiction").

that *might be filed*.[7] That is also true of every other tribal court exhaustion case decided by the Supreme Court. So any broad language in the court's opinions, like that in *LaPlante*, is pure dicta. *See LaPlante*, 480 U.S. at 16 (speaking of an exhaustion rule applying to "any nontribal court").

¶121 And there is reason to believe that the broad dicta should not extend to a case like that presented here. Indeed the terms and structure of the *LaPlante* opinion cut against this extension. *LaPlante* speaks of "exhaustion." Exhaustion, moreover, is a principle that regulates the timing of proceedings in tribunals that operate in a hierarchical relationship.[8] We speak of exhaustion of administrative remedies, for example, as a rule requiring a party challenging the actions of an administrative agency to raise and resolve its claims in the administrative agency before it may raise them in a judicial proceeding.[9] Exhaustion in habeas corpus proceedings is similar. Petitioners in state custody must exhaust available state court procedures before pursuing review in federal court.[10]

¶122 The exhaustion question presented in *LaPlante* is along these same lines. In holding that the plaintiff was required to "exhaust available tribal remedies" before pressing its suit in federal

---

[7] *Hicks* was a declaratory judgment action filed in federal court by the State of Nevada. 533 U.S. at 357. The State was challenging the jurisdiction of a tribal court (in a proceeding pending there) over tribal tort and federal civil rights claims. *Id.*

[8] *Cf. Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 832 (9th Cir. 2008) (en banc) (explaining that exhaustion requires a plaintiff to "obtain a final decision of the highest court in the hierarchy of courts in the legal system at issue"); *Priester v. Baltimore Cty.*, 157 A.3d 301, 310 (Md. Ct. Spec. App. 2017) (describing exhaustion in administrative law as "requir[ing] a grievant to invoke and pursue the administrative process until he or she receives a final decision from the agency at the utmost level of the administrative hierarchy").

[9] *See Woodford v. Ngo*, 548 U.S. 81, 88–89 (2006) ("[N]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.") (citation omitted).

[10] 28 U.S.C. § 2254(b)(1)(A); *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) ("First, a state prisoner must exhaust available remedies before presenting his claim to a federal habeas court.").

court, the court also recognized that if the tribal courts concluded that they had jurisdiction the parties retained the right to "challenge that ruling" by seeking direct review in an action filed "in the [federal] District Court." 480 U.S. at 19. This is the notion of "exhaustion"—the requirement of completing litigation filed in a lower tribunal before seeking ultimate review in a higher one.

¶123 "Due to th[e] relationship" between tribal and federal courts,[11] a plaintiff may not file an action arguably subject to the jurisdiction of the tribal courts "directly in federal court . . . without first exhausting such recourse as is available in Indian courts." *Astorga v. Wing*, 118 P.3d 1103, 1107 (Ariz. Ct. App. 2005). This is the essence of the *LaPlante* rule of exhaustion. And it is not implicated in a case in which there is no hierarchical relationship between the two sovereign courts—and thus no right of direct review.[12] *See Astorga,* 118 P.3d at 1107 (concluding that the "principle of exhaustion"

---

[11] The notion of a hierarchical relationship between the tribal and federal courts is no artifact of "insensitiv[ity]" to the "unique status and history" of Indian tribes. *Supra* ¶ 103. It is a simple description of a controlling premise of federal law. Thus, tribes are admittedly "separate sovereigns" that pre-dated the U.S. Constitution. *Supra* ¶ 104 (quoting *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014)). And in that sense an Indian tribe is certainly distinct from an administrative agency and even a state. But tribal courts and agencies share at least one common characteristic—their decisions on federal issues are subject to direct review in federal court. This puts tribal courts and agencies on parallel footing in their resolution of federal questions. And because tribal jurisdiction is a federal question, *see Nat'l Farmers Union*, 471 U.S. at 857, the tribal courts are subordinate to federal courts on questions of jurisdiction. They have no such relationship with state courts.

[12] "[T]he balance between state and tribal causes of action is not a jurisdictional see-saw, rising and falling in balanced harmony. Rather, determinations of jurisdictional propriety derive from larger notions of shared autonomy, co-existent sovereignty, and the sometimes overlapping boundaries of governmental authority—both geographic and with respect to tribal membership and property ownership." *Hinkle v. Abeita*, 283 P.3d 877, 884 (N.M. Ct. App. 2012).

announced in *LaPlante* "does not apply" to a case filed in state court).[13]

¶124 Justice Himonas says that the applicability of the *LaPlante* principle of exhaustion to state court proceedings is resolved by "fundamental principles of Indian law" announced by the Supreme Court and reiterated in federal statutes. *Supra* ¶ 96. I disagree. It should first be reiterated that there is no controlling authority on this issue. The Supreme Court has never considered the important question presented here.

¶125 Granted, the court has spoken generally about the federal "'policy of leaving Indians free from state jurisdiction and control.'" *Supra* ¶ 96 (quoting *Rice v. Olson*, 324 U.S. 786, 789 (1945)). But these generalities tell us nothing about the key questions presented—as to how far that policy goes and how to balance it against countervailing considerations. This case presents fundamental policy questions of sovereignty and concurrent jurisdiction. Those questions are not resolved by precedent. And in the absence of controlling federal precedent this is a matter of first-impression for our decision.[14]

---

[13] The point is not "to place state courts in a *superior position* to federal courts in cases that implicate tribal jurisdiction." *Supra* ¶ 97 (emphasis added). It is to account for the *inferior* position that we occupy by virtue of our lack of any direct review authority over tribal court decisions.

I see no reason to expect that the approach that I advocate will prompt plaintiffs "overwhelmingly" to avoid the federal forum and file in state court instead. *See supra* ¶ 97. And even if some plaintiffs migrate to state court, that will not at all "subvert the federal policy of encouraging the development of tribal court systems." *Supra* ¶ 97. The policy of "[p]romot[ing] . . . tribal self-government," *LaPlante*, 480 U.S. at 15, is advanced even under the regime that I have in mind—a regime in which the state courts defer to tribal courts as soon as a party invokes their jurisdiction. Indeed I believe that is precisely the regime that the *LaPlante* line of cases has in mind even for cases pending in federal court. *See infra* Part II.

[14] I suppose it's possible, as the Connecticut Supreme Court has indicated, that the U.S. Supreme Court could be deemed to have announced "substantive" federal common law that is "binding in state courts pursuant to the supremacy clause of the federal constitution." *Drumm*, 716 A.2d at 62. But I am unsure of the legal basis for the court to impose such a "substantive" rule by means of

(continued . . .)

¶126 The cited federal statutes—the Indian Child Welfare Act, 25 U.S.C. § 1901 *et seq.*, and the Major Crimes Act, 18 U.S.C. § 1153 *et seq.*—do not establish federal law requiring state courts to stay our exercise of jurisdiction in anticipation of a future-filed action in the courts of an independent (Indian) sovereign. Indeed these statutes seem to me to underscore the lack of any such federal rule. If Congress meant for both federal and state courts to yield to tribal courts in every circumstance where tribal courts have a colorable claim of jurisdiction, there would be no reason for statutes giving tribal courts exclusive jurisdiction. These statutes also show that Congress has the power and ability to give tribal courts jurisdiction when it chooses to do so. *See also Hicks*, 533 U.S. at 365 ("The States' inherent jurisdiction on reservations can of course be stripped by Congress.").

¶127 There is a difference between federal *policy* and federal *law*. Substantive federal law is generally made by Congress.[15] Here there is no applicable law. And the absence of a statute restricting the exercise of our jurisdiction emphasizes the need for us to address the matter head-on.

¶128 Absent a controlling statute or binding precedent from the U.S. Supreme Court, it is incumbent on us to decide how to balance the needed deference to the sovereignty and jurisdiction of the tribal courts. *See Drumm v. Brown*, 716 A.2d 50, 63 (Conn. 1998) (concluding that even if the Supreme Court's precedents establish "only a federal court procedural rule," that court may look to similar policies in

---

(continued . . .)
"common law." That strikes me as the domain of Congress. In any event, however, the court has not in fact announced any common law rule that is applicable here. If and when it does so we will be bound by its precedent. But until then we treat the question of any limits on the exercise of our state-court jurisdiction to be a matter of state law.

[15] *See, e.g.,* U.S. CONST. art. I, § 8 (delegating the power to regulate commerce to Congress, to tax and spend for the general welfare, to enforce the provisions of the civil war amendments, and "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its specific powers).

"adopt[ing] [a] doctrine for the courts of this jurisdiction").[16] I would do so here.

¶129 Thus, I would not find that federal precedent or statutes urge us to follow the framework set forth in *LaPlante*. But I would adopt a rule of exhaustion as a matter of comity under Utah common law—a rule that would call for exhaustion in the face of a pending tribal court proceeding, but not before such a case is actually filed.[17]

II

¶130 Even assuming that the *LaPlante* line of cases applies to state courts, I would not interpret those cases to require exhaustion in the absence of a pending case filed in tribal courts. I agree with the Connecticut Supreme Court's analysis of this issue. *See Drumm v. Brown*, 716 A.2d 50, 64 (Conn. 1998) (concluding that "exhaustion is not required" under *LaPlante* "in the absence of a pending action in the tribal court").

¶131 Again there is no direct holding from the U.S. Supreme Court on this point. "[I]n both cases in which the Supreme Court has held that exhaustion was necessary, namely *National Farmers Union Ins. Cos.* and *Iowa Mutual Ins. Co.* [*v. LaPlante*], a proceeding was already pending in the tribal court." *Id.*

¶132 The terms and structure of the Supreme Court's opinions strongly suggest "that the court contemplated application of the requirement only when a parallel proceeding was pending in the

---

[16] *See also Meyer & Assocs.*, 992 So. 2d at 446 (declining to extend the tribal exhaustion doctrine to state court); *Maxa v. Yakima Petroleum, Inc.*, 924 P.2d 372 (Wash. Ct. App. 1996) (same); *Michael Minnis & Assocs. v. Kaw Nation*, 90 P.3d 1009 (Okla. Civ. App. 2003) (same).

[17] Justice Himonas notes that defendants in these types of suits "could conceivably remove to federal court and then seek application of the tribal exhaustion rule." *Supra* ¶ 97 n.21. In Justice Himonas's view this supports the extension of the exhaustion rule to a case like this one because requiring removal to federal court would "impose the extra procedural hurdle of removal in order to reach the same result." *Supra* ¶ 97 n.21. Removal to federal court is unnecessary, however. The defendant could invoke the tribal court's jurisdiction by filing a declaratory judgment action—thereby creating a pending suit in tribal court. And Utah courts would then require exhaustion of the pending suit in tribal court as a matter of comity.

tribal court." *Id*. The *National Farmers Union* case, for example, "stated that the 'policy of tribal self-government and self-determination . . . favors a rule that will provide *the forum whose jurisdiction is being challenged* the first opportunity to evaluate the factual and legal bases for the challenge.'" *Id*. (quoting *Nat'l Farmers Union Ins. Cos. V. Crow Tribe of Indians*, 471 U.S. 818, 856 (1985)) (emphasis altered). And "[t]his narrow language presupposes an ongoing proceeding in the tribal court." *Id*.

¶133 The notion of deference to a "forum whose jurisdiction *is being challenged*" is reflective of a rule that applies in the face of an existing court proceeding. And one of the exceptions identified in *National Farmers Union* is along the same lines: The exception says that exhaustion is not "required" where the tribal suit "*is* patently violative of express jurisdictional prohibitions." 471 U.S. at 856 n.21 (emphasis added); *see also Drumm*, 716 A.2d at 64 (making this point).

¶134 There is further language in *LaPlante* that reinforces this view. As the Connecticut Supreme Court noted, *LaPlante* mandates that "'federal courts should not *intervene*' in tribal court proceedings." *Drumm*, 716 A.2d at 64 (quoting *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 17 (1987)) (emphasis in *Drumm*)). This "reinforces the impression that the court contemplated application of the rule specifically where tribal court proceedings have commenced." *Id. Intervention* is not possible without a pending action. And that suggests that the *LaPlante* rule of exhaustion is implicated in the presence of an actual pending proceeding in tribal court. *See also id*. (quoting *Granberry v. Greer*, 481 U.S. 129, 131 n.4 (1987), for the proposition that the *LaPlante* principle of exhaustion was triggered by a "parallel tribal court proceeding"); *id*. at 65 (quoting *Strate v. A-1 Contractors*, 520 U.S. 438, 448 (1997), speaking of "an exhaustion rule allowing tribal courts initially to respond to an invocation of their jurisdiction").[18]

---

[18] The reasoning in U.S. Supreme Court abstention cases also supports this position. *Younger v. Harris*, 401 U.S. 37 (1971), prohibited federal courts from enjoining pending state court criminal proceedings, and *Samuels v. Mackell*, 401 U.S. 66 (1971), prohibited federal courts from providing declaratory relief to plaintiffs who are subject to corollary state criminal prosecution. The *Younger* court's reasoning rested on "proper respect for state functions" and on "not unduly interfer[ing] with the legitimate activities of the States." 401 U.S. at 44. But federal courts must proceed in the absence of a

(continued . . .)

¶135 Justice Himonas resists this conclusion on the ground that *LaPlante* announces a "rule of *exhaustion*, not abstention." *Supra* ¶ 106. But the dichotomy set up by Justice Himonas is overstated. The principle of abstention is not limited to the notion of "balanc[ing] multiple factors" such as "judicial economy concerns and the avoidance of piecemeal litigation." *Supra* ¶ 106. Abstention is simply the idea of a court of one sovereign staying its hand in the face of the exercise of jurisdiction by another. *See Younger v. Harris*, 401 U.S. 37, 43 (1971) (restraining federal courts to allow "state courts to try state cases free from interference by federal courts"). Abstention, just as exhaustion, is based on concerns regarding comity and deference to ongoing judicial proceedings. And courts have no discretion with some forms of abstention, as in *Younger* abstention, but must dismiss or stay the federal suit. *Id.* (holding that absent several narrow exceptions, federal courts must abstain from enjoining state court criminal proceedings). Exhaustion and abstention, then, are closely related doctrines, and speaking of this as an exhaustion case rather than an abstention case does not tell us the answer to the question presented.

¶136 *LaPlante*, in fact, speaks of its "rule" as a form of "abstention." It does so implicitly in its prohibition on *intervention* in a tribal court action and its mandate for deference to a current "challenge to [the tribal court's] jurisdiction." *LePlante*, 480 U.S. at 16 (internal quotation marks omitted). And it even does so explicitly— in stating that the *LaPlante* "rule is analogous to principles of abstention articulated in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976)." *Id.* at 16 n.8.

¶137 The substance of the *LaPlante* court's analysis also reinforces this view. Again I agree with the Connecticut Supreme Court's view of the matter. The *LaPlante* exhaustion rule can easily be understood

(continued . . .)

pending state action because the same policy considerations are not present. *Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (noting that a federal court's proceeding in the absence of a corollary state court proceeding cannot "be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles"). Similarly, when neither party has invoked the tribal court's jurisdiction, a state court exercising its jurisdiction cannot be viewed, as Justice Himonas suggests, as intruding on "tribal self-government and self-determination." *See supra* ¶ 97 (citing *LaPlante*, 480 U.S. at 15).

to be limited to a case in which there is a live, pending proceeding in tribal court. That conclusion, in fact, is reinforced by the specific policy considerations identified in *LaPlante* and *National Farmers Union*. *See Drumm*, 716 A.2d at 65 (concluding that the concerns "upon which the doctrine is based [are] most pressing when a parallel proceeding is pending in the tribal court").

¶138 The first consideration identified in *LaPlante* is the "federal policy supporting tribal self-government," which "directs a federal court to stay its hand in order to give the tribal court 'a full opportunity to determine its own jurisdiction.'" *LaPlante*, 480 U.S. at 16 (citation omitted). The *National Farmers Union* formulation of this policy is similar. There the court spoke of the need to allow the "forum whose jurisdiction is being challenged" to have the "first opportunity to evaluate the factual and legal bases for the challenge." 471 U.S. at 856. As noted above, both of these statements of policy presuppose the pendency of a parallel proceeding in tribal court. Tribal courts are not charged with assessing their own jurisdiction on their own accord—without a case having been filed by the parties. So the directive for a nontribal court to "stay its hand" to "give the tribal court a full opportunity to determine its own jurisdiction" makes no sense unless and until a parallel tribal proceeding is actually filed.

¶139 As the Connecticut Supreme Court put it, "the risk that adjudication by the nontribal forum will impair the tribal court's authority" is implicated "where proceedings arising from the same transactions and occurrences, and involving substantially the same issues and parties, are pending in both a tribal and nontribal court." *Drumm*, 716 A.2d at 65. But "the impact on a tribal court's authority of a nontribal court's adjudication of a matter over which the tribal court could, but has not, exercised jurisdiction" is unclear. *Id.* "Any such effect is speculative and indirect, consisting merely of a lost opportunity or a potential unrealized." *Id.*

¶140 *National Farmers Union* also raised a concern about the "procedural nightmare" that would ensue if an "underlying tort action" is allowed to proceed with a pending tribal proceeding hanging in the balance. 471 U.S. at 853, 856 (discussing the policy of the advancement of the "orderly administration of justice"). The court expressed discomfort with the potential procedural complexities arising where a defendant is allowed to challenge tribal

court jurisdiction first in federal court.[19] *Id.* at 856. But again this policy is only clearly implicated in the face of a pending tribal proceeding. There is no "procedural nightmare" without two pending, overlapping cases. Indeed the majority's holding here—its requirement of a separate filing in a tribunal of a separate sovereign—itself interferes with the "orderly administration of justice." The parties to this case are apparently content to have their differences resolved in our Utah courts. The plaintiffs filed the case here and no defendant saw fit to file a separate (declaratory) proceeding in tribal court. Unless and until that happens, there is no "procedural nightmare" and no interference with the "orderly administration of justice."

¶141 That also holds for the third policy identified in the *National Farmers Union*—the concern that a rule of exhaustion "will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction," and "provide other courts with the benefit of their expertise in such matters in the event of further judicial review." *Id.* at 857. The majority says that "*forcing* Harvey to litigate in tribal court" will "provide[] clarity to the parties and any reviewing court on how the tribe views its own jurisdiction." *Supra* ¶ 51 (emphasis added). Perhaps that is true. But *National Farmers Union* does not speak of "forcing" anyone to file a separate action in tribal court. It is concerned with allowing tribal courts to "explain" their "basis *for accepting jurisdiction.*" 471 U.S. at 857 (emphasis added). And the notion of *acceptance* of jurisdiction presupposes a suit filed in tribal court at the voluntary instance of the parties.

¶142 The rule adopted by the majority seems to me to get things backwards. By telling parties who were content to resolve their grievance in our courts that they *must* pursue a parallel action in the courts of a separate sovereign, the court is neither advancing the

---

[19] The procedural nightmare that concerned the court arose in a case in which the defendant challenged tribal jurisdiction first in federal court without answering the complaint in tribal court. That led to a series of inconsistent decisions: The tribal court entered a default judgment, the federal district court entered a permanent injunction against the tribal court proceedings, and the federal appellate court reversed the entry of the injunction. *Nat'l Farmers Union*, 471 U.S. at 847, 856. This sort of "procedural nightmare" is not at all presented here. Because no tribal suit has yet been filed, this case is simple and straightforward as it now stands.

"orderly administration of justice" nor furthering Indian "self-governance." The Indian defendants named in this suit are also citizens of the State of Utah. *See Meyers v. Bd. of Educ. of San Juan Sch. Dist.*, 905 F. Supp. 1544, 1564 (D. Utah 1995) ("[O]f course, on-reservation Indians are citizens of the state within which they reside."). As such they are entitled to access to our courts to resolve their differences with the plaintiffs. By directing them to file a declaratory suit in tribal court—a suit they have heretofore declined to file—we are not respecting their right of self-governance. We are overriding it.

¶143 This is a separate basis for the holding of the Connecticut Supreme Court in *Drumm*. There the court emphasized that "'[c]ourts are in the business of ruling on litigants' contentions, and they generally operate under the rule essential to the efficient administration of justice, that where a court is vested with jurisdiction over the subject-matter . . . and . . . obtains jurisdiction of the person, it becomes its . . . duty to' adjudicate the case before it." 716 A.2d at 65 (quoting *Ahneman v. Ahneman*, 706 A.2d 960, 966 (1998) (alternations in original)). "[T]his rule is not absolute." *Id*. "It may be relaxed, however, only 'in an extreme, compelling situation,'" as where "a proceeding arising out of the same transactions and occurrences, and involving substantially the same issues and parties, is pending before a tribal court." *Id*. (citation omitted). In that instance a rule of exhaustion makes sense, in light of the "likelihood that state court adjudication will interfere with the proper authority of the tribal court over reservation affairs, in conflict with the federal policy supporting tribal self-government and self-determination." *Id*. "[W]here the tribal court *potentially* has jurisdiction over a matter," however, "but no proceeding is pending before it, the attenuated effect on the tribal court's authority of a nontribal court's adjudication of the matter is not sufficiently compelling to outweigh the general obligation upon a court to exercise its jurisdiction when it has been properly invoked." *Id*. at 65–66 (emphasis added).

¶144 I would so hold. I would conclude that there is no binding federal law requiring the parties to this proceeding to file an action in tribal court. And unless and until such an action is filed, I would defer to the parties' choice of the Utah courts as the forum for the resolution of their dispute. *See id.* at 66 (noting that some of the parties in that case had filed a "tribal court action during the pendency of th[e] appeal," triggering a rule of "exhaustion" as to those parties).

III

¶145   Perhaps in time the U.S. Supreme Court will extend its precedents and impose a requirement of exhaustion in a case like this one. Or maybe Congress will enact a law restricting the jurisdiction of the state courts in cases where the parties could file in tribal court. But in the absence of any such statute or precedent addressed to the questions of sovereignty and concurrent jurisdiction at issue here, I would not embrace a requirement of exhaustion of tribal remedies in a case in which no one has expressed an interest in seeking such a remedy. We owe it to the parties who invoke our jurisdiction to resolve the dispute that is presented for decision. And I would find that presumption rebutted only in case of a direct conflict between an action filed in our courts and a parallel proceeding pending in tribal court.